UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TOWER CONSTRUCTION, LLC,
a Michigan limited liability company,

and

THE MAIN OF ROYAL OAK, LLC,
a Michigan limited liability company,

     Plaintiffs,

v.

CITY OF ROYAL OAK, MICHIGAN,
a Michigan municipal corporation,

     Defendant.

Case No.   2:25-cv-13344
Hon.

   Demand for Jury Trial

_____

Gregory D. Hanley (P51204)
Edward F. Kickham III (P70332)
Jamie K. Warrow (P61521)
Kickham Hanley PLLC
32121 Woodward, Suite 300
Royal Oak, MI 48073
(248) 544-1500
Attorneys for Plaintiffs
_____

**PLAINTIFFS' COMPLAINT AND JURY DEMAND**

Plaintiffs Tower Construction, LLC and The Main of Royal Oak, LLC

("Plaintiffs"), by their attorneys, Kickham Hanley PLLC, state as follows for their

Complaint against Defendant City of Royal Oak, Michigan (the "City"):

## INTRODUCTION

1.      This is an action challenging exorbitant building permit fees (the "Permit Fees") the City imposed on Plaintiffs between December 2022 and January 2024, purportedly to recover costs the City incurred in reviewing plans and issuing building permits related to Plaintiffs' redevelopment of the property located at 118 N. Main Street, Royal Oak, MI 48067 (the "Property").  The City's conduct imposed an "unconstitutional condition" on Plaintiffs' receipt of permits necessary to complete a major development project at the Property, which is a federal claim redressable under 42 U.S.C. Section 1983.

2.      The City's conduct also violated the Construction Code Act memorialized in a Michigan statute, MCL 125.1522(1), which requires a municipality like the City to "establish reasonable fees" for the activities of its building department which are "**intended to bear a reasonable relation to the cost, including overhead, to the governmental subdivision of the acts and services**, including, without limitation, those services and acts as, in case of an enforcing agency, **issuance of building permits, examination of plans and specifications**, inspection of construction undertaken pursuant to a building permit, and the issuance of certificates of use and occupancy, and, in case of a board of appeals, hearing appeals in accordance with this act." [emphasis added].

3.      The Property is the former site of the Main Art Theater, which closed in 2021.

4.     Plaintiff The Main of Royal Oak, LLC (hereafter, "The Main") acquired and sought to redevelop the Property as a three-story multi-use facility with residential, office and retail uses (the "Development").

5.     As a condition of its approval of the Development, the City required Plaintiffs to pay fees, purportedly for the review and approval of building plans and the issuance of building permits (the "Permit Fees").

6.     The Permit Fees were exorbitant and impermissible.

7.     The amount of the Permit Fees was not calculated to recover the City's cost of reviewing and approving the plans for the Development (the "Plans").

8.     The amount of the Permit Fees was not, for example, based on the number of hours City employees or contractors spent reviewing the Plans.

9.     Instead, the amount of the Permit Fees was based solely on the Development's purported "construction value."   *See* Master Administrative Fee Schedule 2023, Exhibit A hereto, p. 10 (the "Fee Schedule").

10.    The amount of the Permit Fees thus bore no reasonable relationship to the direct and indirect costs the City incurred in reviewing and approving Plaintiffs' Plans.

11.    The amount of the Permit Fees was in fact grossly disproportionate to the burdens placed upon the City relating to the Development.  This is because the "construction value" of the Project bears no reasonable relation to the City's actual direct and indirect cost of reviewing and approving Plans.

12.     The City's actions constitute a taking of Plaintiff's property, for which the United States Constitution requires the City to pay just compensation to Plaintiff.

13.     Plaintiffs seek a money judgment against the City to compensate Plaintiffs for the amounts they expended to comply with the City's unconstitutional condition, which are in excess of $400,000.

14.     The City's Permit Fees also violated the Michigan Construction Code Act, MCL 125.1522(1), because they bear no reasonable relationship to the costs the City incurred in reviewing and approving Plaintiffs' Plans.

15.     The Construction Code Act essentially requires municipalities to run their building departments on a "revenue-neutral basis."

16.     Despite this dictate, the City's overcharges for Permit Fees have been systemic and long-standing, which has allowed the City to stockpile over $16 million in its Construction Code Fund.

17.     Indeed, while the City grew its Construction Code Fund cash balance from an already-exorbitant $8 million to an egregious $16 million, the Michigan Supreme Court was in the process of invalidating the City of Troy's building department fees, partly because Troy accumulated a relatively small $1 million reserve attributable to its building department.  *See Michigan Assn' of Home Builders v. City of Troy*, 504 Mich. 204; 934 N.W.2d 713 (2019); *Michigan Assn' of Home Builders v. City of Troy*, No. 365166; 2024 Mich. App. LEXIS 8354 (Oct. 16, 2024) (Exhibit B hereto).

18.    As a result, the City's Permit Fees, as applied to Plaintiffs and viewed as a whole, have been excessive and therefore unreasonable.

19.    Plaintiffs seeks a refund of all Permit Fees the City imposed or collected in excess of the amount necessary to pay the City's actual direct and indirect costs of reviewing plans and issuing the building permits for the Development (the "Overcharges").

## JURISDICTION AND VENUE

20.    Plaintiff Tower Construction, LLC ("Tower") is a Michigan limited liability company that provided construction services for the Development and paid the Permit Fees to the City on behalf of Plaintiff The Main of Royal Oak, LLC.

21.    Plaintiff The Main of Royal Oak, LLC (the "Main") is a Michigan limited liability company that owns the real property that is the site of the Development (the "Property").   Tower passed on the Permit Fees to The Main, and The Main reimbursed Tower for the cost of the Permit Fees.

22.    Defendant City of Royal Oak (the "City") is a municipality located in Oakland County, Michigan.

23.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. 1331, because this Court has original subject matter jurisdiction of all civil actions arising under the U.S. Constitution and Plaintiffs' claims include a claim arising under the 5th Amendment Takings Clause of the U.S. Constitution, which applies to the City

through the 14th Amendment to the U.S. Constitution.   Plaintiffs are entitled to enforce these rights through a civil action under 42 U.S.C. § 1983.

24.   This Court has supplemental jurisdiction over Plaintiffs' common law unjust enrichment claim for violation of the Michigan Construction Code Act under 28 U.S.C. § 1367 because that claim forms part of the same case or controversy as Plaintiffs' takings claim.

25.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because the City is located in this District and the actions which gave rise to Plaintiffs' causes of action occurred in this District.

## GENERAL ALLEGATIONS

26.   The City charges Permit Fees in connection with industrial, commercial and residential construction projects.

27.   The City maintains a Construction Code Fund that is separate from its General Fund.  *See* FY 2023-24 Budget, attached in part as Exhibit C hereto, pp. 256-259.

28.   The City describes its Construction Code Fund as follows:

> The building inspection division issues permits for commercial and residential construction projects and performs related building, mechanical, electrical and plumbing inspections throughout the construction process to ensure compliance with state construction codes and local ordinances. **Fees are intended to cover the costs of this special revenue fund.**  [*Id.*, p. 256 (emphasis added).]

- 6 -

29. When Plaintiffs sought to redevelop the Property in 2022, the City, under its Charter and Ordinances, required Plaintiffs to obtain the City's approval for the Development.

30. As a condition of the City's approval, the City required Plaintiffs to pay the Permit Fees.

31. Between December 2022 and January 2024, the City charged Plaintiffs the following Permit Fees in connection with the Development.

- Shell Retail: Building Permit Fee ($317,190.00) paid on 12-5-22 / Plan Review Fees ($33,327.88) paid on 11-17-22
- Dassault: Plan Review Fee ($4,752.00) paid on 5-24-23
- Apartments: Building Permit Fee ($37,200.00) paid on 1-4-24 / Plan Review Fee ($4,650.00) paid on 7-27-23

32. Plaintiffs paid the majority of the Permit Fees under express protest. *See, e.g.*, Tower Construction letter dated December 5, 2022, Exhibit D hereto ("We are paying the $317,347.00 building permit fee in protest in order to keep the project moving forward …").

33. Plaintiffs' letter of protest expressly or impliedly extended to the remainder of the Permit Fees, which were paid after the date of the protest letter.

34. The Fee Schedule sets forth how the City calculates the Permit Fees for commercial buildings, including the Permit Fees it charged Plaintiffs.

35. The Fee Schedule shows that the City charges a "Plan Review Fee" for commercial projects equal to ".0015 x construction value". *Id.*

36. A commercial "Building Permit Fee" starts at "$12.00 per $1,000.00 in construction value" for buildings having "up to $10 million in estimated value of construction or fraction thereof, rounded to the next highest $1,000.00 ($200.00 minimum fee)".

37. The City's Permit Fees could potentially be reasonable if, for example, they were based on the total hourly compensation (salary plus benefits, payroll taxes,etc.) attributable to the City employees who performed the plan reviews and issued the building permits, plus the overhead associated with those employees. Indeed, that is exactly what the Construction Code Act requires.

38. It would not be necessary for an employee to be paid by the hour for the City to calculate his or her total hourly compensation.

39. For example, the City could calculate a salaried employee's total hourly compensation in several ways, for example by dividing the employee's total annual compensation by his or her total annual hours worked, minus some overhead factor for administrative tasks, to arrive at an approximate hourly rate.

40. Consider a hypothetical employee who receives a salary of $80,000, plus benefits worth $30,000 (total compensation $110,000), and who works 40 hours per week, 48 weeks per year. He or she would work 1,920 hours per year, at an approximate cost to the City of $57.29 per hour.

41. Let's say that employee spends 300 hours per year on unavoidable administrative tasks or other work that is not related to actually reviewing plans or

issuing permits **and** is not related to any other service for which the City charges a fee.

42.     A permit holder would naturally have to absorb the cost of those administrative tasks.  That would increase the employee's per-hour cost to the City to $67.90 per hour of plan review or permit issuance.

43.     In this hypothetical situation, it would be reasonable for the City to charge Plaintiffs Permit Fees of $67.90 for each hour the employee actually spends reviewing plans and issuing permits related to the Development.

44.     The cost to the City of the hypothetical employee's work would naturally scale with the complexity of each project, as well as other factors that might increase the amount of time the employee requires to review plans and issue permits for a particular project.

45.     In fact, the Fee Schedule sets a fee of $70 per hour for "Inspector meeting (per inspector, per hour)", which demonstrates that the City is capable of determining the cost of an hour of employee time for certain tasks.  *See* Fee Schedule, Exhibit A hereto, p. 10.

46.     However, the City does not determine or apply the cost per hour of employee time with respect to the Permit Fees, and instead sets the Permit Fees based on a particular project's total "construction value."

47.     It thus becomes obvious that the City's method of charging Permit Fees based on the dollar cost of construction is wholly unrelated to its actual cost of paying employees to review plans and issue permits.

48.     The Permit Fees at issue in this lawsuit, which are based solely on the cost of construction, bear no relation to the City's actual direct and indirect cost of reviewing plans, issuing permits or any other activity relating to the Development.

49.     Not surprisingly, the City's exorbitant Permit Fees have allowed the City to impermissibly amass a king's ransom in its Construction Code Fund.

50.     The City's annual certified financial statements (Exhibit E hereto) confirm that the building department fees have far exceeded the amounts that "bear a reasonable relationship to the cost" incurred by the City for "services and acts" relating to the issuance of permits and other associated activities.

51.     Between July 1, 2018 and June 30, 2024, through overcharges, the City consistently grew the fund balance in its CCF **from $8.5 million to over $16.4 million**, which is proof positive that the Permit Fees are not calculated to recover the City's "cost of service" as the Construction Code Act requires. *See* Exhibit E hereto.  The City's CCF balance grew as follows:

**FY 2019**

> Starting CCF Balance:  **$8,468,816**

> Ending CCF Balance:  $9,804,403

> Increase in CCF Balance:  **$1,335,587**

CCF Revenues: $3,921,756

CCF Expenditures:  $1,720,169

CCF Profit:  **$2,201,587**

**FY 2020**

Starting CCF Balance:  $9,804,403

Ending CCF Balance: $11,469,793

Increase in CCF Balance:  **$1,665,390**

CCF Revenues:  $3,085,105

CCF Expenditures:  $1,381,715

CCF Profit: **$1,703,390**

**FY 2021**

Starting CCF Balance:  $11,469,793

Ending CCF Balance:  $12,747.201

Increase in CCF Balance:  **$1,277,408**

CCF Revenues:  $2,813,073

CCF Expenditures: $1,532,665

CCF Profit:  **$1,280,408**

**FY 2022**

Starting CCF Balance: $12,747,201

Ending CCF Balance: $13,477,638

Increase in CCF Balance:  **$730,437**

CCF Revenues:  $2,400,807

CCF Expenditures: $1,743,070

CCF Profit: **$657,737**

**FY 2023**

Starting CCF Balance: $13,477,638

Ending CCF Balance:  $15,471,051

Increase in CCF Balance: **$1,993,413**

CCF Revenues:  $3,760,038

CCF Expenditures:  $1,716,099

CCF Profit:  **$2,043,939**

**FY 2024**

Starting CCF Balance:  $15,471,051

Ending CCF Balance:  $16,439, 087

Increase in CCF Balance:  **$968,036**

CCF Revenues:  $2,934,289

CCF Expenditures:  $1,969,574

CCF Profit:  **$964,715**

**PAYMENT OF THE PERMIT FEES IS MANDATORY**

52.     Payment of the Permit Fees is not voluntary because the City requires Plaintiffs to pay the Permit Fees in exchange for the City's permission to develop the Property.

53.     That Plaintiffs could choose not to build on the Property, or to build a less expensive project, does not make the Permit Fees voluntary.

54.     Plaintiffs must pay the Permit Fees, at least under protest (as they did here), if they are to fully utilize the Property and build the Development in the manner they desire.

**THE CITY'S IMPOSITION OF THE PERMIT FEES ALSO IS UNLAWFUL BECAUSE MICHIGAN'S STILLE-DEROSSETT-HALE SINGLE STATE CONSTRUCTION CODE ACT REQUIRES THE PERMIT FEES TO BE REASONABLE**

55.     MCL 125.1522(1) provides:

The legislative body of a governmental subdivision shall establish reasonable fees to be charged by the governmental subdivision for acts and services performed by the enforcing agency or construction board of appeals under this act, **which fees shall be intended to bear a reasonable relation to the cost, including overhead, to the governmental subdivision of the acts and services**, including, without limitation, those services and acts as, in case of an enforcing agency, **issuance of building permits, examination of plans and specifications**, inspection of construction undertaken pursuant to a building permit, and the issuance of certificates of use and occupancy, and, in case of a board of appeals, hearing appeals in accordance with this act. [emphasis added]

56.     Here, the City's Permit Fees do not "bear a reasonable relation to the cost, including overhead" of performing inspections and issuing permits.

57.     The Permit Fees cannot possibly have such a reasonable relationship because they are based solely upon "construction value," which bears only a wholly speculative relationship to the actual cost of performing inspections and issuing permits.

## COUNT I
## TAKING OF PROPERTY WITHOUT JUST COMPENSATION
## 28 U.S.C. SECTION 1983

58.     Plaintiffs incorporate all preceding paragraphs of this Complaint as if fully set forth herein.

59.     "The Fifth Amendment's Takings Clause, as incorporated against the states by the Fourteenth Amendment, provides: 'nor shall private property be taken for public use, without just compensation.'" *Knight v. Metro. Gov't of Nashville & Davidson Cnty*, 67 F.4th 816, 822 (6th Cir. 2023) (quoting U.S. CONST. AMEND. V and citing *Chi., Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226, 241 (1897)).

60.     One recognized form of taking is an "unconstitutional condition." *Id.* at 823–24.   In this context, the government "does not . . . directly interfere with constitutional rights," but rather "indirectly interferes with them by offering a benefit that it has no duty to provide on the condition that a party waive a right." *Id.*

61.     In the land-use context, "the typical 'benefit' consists of a permit that allows an owner to develop a property for a specific use (such as a residence . . . )." *Id.* at 824 (citing *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 601–02 (2013);

*Dolan v. City of Tigard*, 512 U.S. 374, 379– 80 (1994); and *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 828 (1987)).

62.    At bottom, "a unit of government may not condition the approval of a land-use permit on the owner's relinquishment of a portion of his property unless there is a 'nexus' and 'rough proportionality' between the government's demand and the effects of the proposed land use." *Koontz*, 570 U.S. at 599. For example, "if a proposed development will 'substantially increase traffic congestion,' the government may condition the building permit on the owner's willingness 'to deed over the land needed to widen a public road.'" *Sheetz v. County of El Dorado*, 601 U.S. 267, 274–75 (2024) (citing *Koontz*, 570 U.S. at 605). "In evaluating the constitutionality of a[] [condition], [courts] must balance (1) the vulnerability of 'land-use permit applicants' who can be strongarmed by government entities with 'broad discretion' with (2) legitimate government interests in 'landowners internaliz[ing] the negative externalities of their conduct.'" *Ballinger v. City of Oakland*, 24 F.4th 1287, 1298 (9th Cir. 2022) (quoting *Koontz*, 570 U.S. at 604–05).

63.    The Supreme Court has enunciated a two-part test for determining whether a condition for the granting of a land use permit is unconstitutional.  First, "permit conditions must have an 'essential nexus' to the government's land-use interest." *Sheetz*, 601 U.S. at 275 (citing *Nollan*, 483 U.S. at 837); see also *Knight*, 67 F.4th at 825 ("'[T]he government must show a 'nexus' between the condition [imposed] and the project's social costs; that is, the government must impose the

- 15 -

condition because of those costs and not for other reasons." (citing *Nollan*, 483 U.S. at 837)). "The nexus requirement ensures that the government is acting to further its stated purpose . . . ." *Sheetz*, 601 U.S. at 275 (citing *Nollan*, 483 U.S. at 841). When "conditions lack a sufficient connection to a legitimate land-use interest, they amount to 'an out-and-out plan of extortion.'" *Id.* (quoting *Nollan*, 483 U.S. at 837).

64.     Second, "[t]he government next must show a 'rough proportionality' between the condition and the project; that is, the condition's burdens on the owner must approximate the project's burdens on society." *Knight*, 67 F.4th at 825 (citing *Dolan*, 512 U.S. at 391). This additional step in the analysis exists because "[a] permit condition that requires a landowner to give up more than is necessary to mitigate harms resulting from new development has the same potential for abuse as a condition that is unrelated to that purpose." *Sheetz*, 601 U.S. at 276 (citing *Dolan*, 512 U.S. at 393). Although rough proportionality requires no "precise mathematical calculation," it still requires the government to "make some sort of individualized determination that the [condition imposed] is related both in nature and extent to the impact of the proposed development." *Dolan*, 512 U.S. at 391.

65.     Notably, the government need not actually physically occupy the Property.  Instead, a taking can occur if the government requires a developer to pay money that is not proportional to the project's impacts.  In *Koontz*, for example, the Supreme Court rejected the lower court's conclusion that an asserted takings claim failed "because [the government unit] asked [the plaintiff] to spend money rather than

give up an easement on his land." 570 U.S. at 611–612.  It did not matter that "the subject of the exaction . . . was money rather than a more tangible interest in real property." *Id.* at 612 (citation omitted).

66.     Here, there is no 'rough proportionality' between the condition and the project, because the condition's burdens on Plaintiffs – the payment of exorbitant Permit Fees -- do not even remotely "approximate the project's burdens on society."

67.     The "burden on society" related to plan review and building inspections is limited to the cost to the City of paying its employees to conduct a particular review and inspection.

68.     There is not necessarily any relationship between the "burden on society" arising from plan review and building inspections and the cost of building a particular project.

69.     In this instance, there was no reasonable relationship between the cost of construction and the burden of performing the plan review and building inspections.

70.     42 U.S.C. § 1983 provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. …

71.     The City is a "person" under 42 U.S.C. Section 1983.

72. The City's actions were taken under color of state law pursuant to an official policy and practice of the City.

73. The City's actions deprived the Plaintiffs of rights owed to them and secured by the Constitution.

74. The City's actions have deprived Plaintiffs of their property rights in violation of the Fifth Amendment because the City has not paid "just compensation" for its invasion of Plaintiffs' property rights.

75. Plaintiffs' property was taken for a "public use" within the meaning of the Takings Clause.

**COUNT II**
**UNJUST ENRICHMENT**
**VIOLATION OF MCL 125.1522(1)**

87. Plaintiffs incorporate Paragraphs 1 through 57 of this Complaint as if fully set forth herein.

88. MCL 125.1522(1) provides that "a governmental subdivision shall establish reasonable fees to be charged by the governmental subdivision for acts and services performed by the enforcing agency or construction board of appeals under this act, which fees shall be intended to bear a reasonable relation to the cost, including overhead, to the governmental subdivision of the acts and services …"

89. The City's Permit Fees are not reasonably related to the cost, including overhead, to the City of providing plan review and building inspections.

90.     As a direct and proximate result of the City's improper conduct, the City has collected monies to which it is not entitled.

91.     By paying the Permit Fees, Plaintiffs have conferred a benefit upon the City.

92.     The City has been unjustly enriched because it received Permit Fees to which it was not entitled, and it would be unfair for the City to retain Permit Fees under the circumstances.

93.     The City should be required to disgorge the amounts by which it has been unjustly enriched.

WHEREFORE, the City should be required to disgorge the Permit Fees Plaintiffs paid in connection with the Development, or in the alternative, to disgorge the portion of the Permit Fees that exceeds the cost the City incurred by paying its employees to perform plan reviews and issue permits.  In addition, the Court should permanently enjoin the City from imposing on or collecting from Plaintiffs Permit Fees that exceed the cost the City incurs by paying its employees to perform plan reviews and issue permits with respect to any particular project in the future.

## PRAYER FOR RELIEF

Plaintiffs request that the Court grant the following relief:

A.      With respect to Count I, enter judgment in favor of Plaintiffs and against the City in an amount deemed to be just compensation for the City's taking of Plaintiffs' property in violation of the U.S. Constitution.

B.    With respect to Count II, enter judgment in favor of Plaintiffs and against the City, and order and direct the City to disgorge and refund Permit Fees it collected from Plaintiffs in connection with the Development, or in the alternative, to disgorge the portion of the Permit Fees that exceeds the direct and indirect costs the City incurred by paying its employees to perform plan reviews and issue permits for the Development.

C.    Find and declare that the City's act of conditioning Plaintiffs' land use approvals on payment of Permit Fees that did not bear a reasonable relation to the cost of reviewing plans and issuing permits constituted a taking of Plaintiffs' property for which the City must pay just compensation to Plaintiffs;

D.    Find and declare that Permit Fees violate MCL 125.1522(1), and permanently enjoin the City from imposing on or collecting from Plaintiffs Permit Fees that exceed the City's cost of reviewing plans and issuing permits with respect to any particular project in the future;

E.    Award Plaintiffs the costs and expenses incurred in this action, including reasonable attorneys', accountants', and experts' fees; and

F.    Grant any other appropriate relief.

KICKHAM HANLEY PLLC


By: /s/ Gregory D. Hanley
  Gregory D. Hanley (P51204)
  Edward F Kickham III (P70332)
  Jamie Warrow (P61521)
Attorneys for Plaintiffs and the Class
32121 Woodward Avenue, Suite 300
Royal Oak, Michigan 48073

Dated : October 21, 2025 ,

## **JURY DEMAND**

Plaintiffs hereby demand a jury trial on all issues so triable.


KICKHAM HANLEY PLLC


By: /s/ Gregory D. Hanley
  Gregory D. Hanley (P51204)
  Edward F Kickham III (P70332)
  Jamie Warrow (P61521)
Attorneys for Plaintiffs and the Class
32121 Woodward Avenue, Suite 300
Royal Oak, Michigan 48073

Dated :  October 21, 2025

# EXHIBIT A



**Finance Department**
203 South Troy Street
Royal Oak, MI 48067
**www.romi.gov**

**Adoption of Master Administrative Fee Schedule**
**Effective Date of July 1, 2023**

May 22, 2023

The Honorable Mayor Fournier and
Members of the City Commission:

As part of the city's annual budget process, administration reviews the fees charged by the various departments to ensure the rates being charged align with the actual costs of providing that service. While many of these fee amounts are specifically set by ordinance or city charter, many others are not. The fees that are set outside of these documents are periodically brought before the city commission for confirmation, changes, and/or to establish a new fee.

Previously, each department has maintained their own fee schedule and has been responsible for bringing any requested changes to the city commission, as the department deemed necessary.

In an effort to provide residents, contractors, and other city customers with an easier way to access fee information, the master administrative fee schedule has been created (Attachment 1). It is the administration's intent to update this document annually during the budget process and present it for city commission review and approval.

It should be noted that any fees established by city charter or city ordinance are limited to the amount established therein. Also, while due diligence was exercised in creating this initial document, administration recognizes other fees may exist outside of this document and every effort will be made to incorporate them in later versions.

The master administrative fee schedule (Attachment 1), if approved, will be posted on the city website for ease of access.

Changes or addition of fees have been highlighted (Attachment 2), to provide city commission with a point of reference for how the adopted fees may impact the end users. Any interim requests for fee changes or additions will be brought separately for approval as amendments to this document.

The finance department and city manager's office recommend the adoption of the master administrative fee schedule with an effective date of July 1, 2023.

If the city commission agrees with this recommendation, the follow resolution would be appropriate:

> **Be it resolved**, the city commission hereby approves the master administrative fee schedule and establishes the fees contained therein as effective beginning July 1, 2023.

Respectfully submitted,
Debra Peck Lichtenberg
Finance Director

Approved,

Paul J. Brake, ICMA-CM, CEcD
City Manager

2 Attachments



**City of Royal Oak**

# Master Administrative Fee Schedule

**Effective July 1, 2023**

*Adopted by City Commission:*    *5/22/2023*

*This fee schedule lists various fees for services established annually by the City Commission.*
*Any fees established by City Charter or City Ordinance are limited to the amount established therein.*
*Other fees may exist outside of this document and may be incorporated in later versions.*

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
### Effective July 1, 2023

| DEPARTMENT | FEE TYPE | PAGE |
|---|---|---|
| **Animal Shelter** | Adoption | 5 |
| | Stray Boarding | 5 |
| | Surrender | 5 |
| **Assessing** | Property Records and Lists | 6 |
| | Service Fees | 6 |
| | Land Division | 6 |
| **City Clerk** | Freedom of Information (FOIA) | 7 |
| | Birth / Death Certificates | 7 |
| | Dog Licensing / Dog Park Membership | 7 |
| | Dangerous Dog | 7 |
| | Applications and Permits | 8-9 |
| | Liquor License | 9 |
| | Recreational Marijuana | 9 |
| | Commission Room Chamber Rental | 9 |
| **Community Development** | Commercial Construction | 10 |
| **-Building Department** | Residential Construction | 11 |
| | Plumbing Fee Schedule | 12 |
| | Sewer Fee Schedule | 13 |
| | Mechanical Fee Schedule | 13-14 |
| | Electrical Fee Schedule | 14-15 |
| | Rental License Application | 16 |
| **Community Development** | Ordinance Enforcement Administration | 16 |
| **-Code Enforcement** | Rodent Harborage | 16 |

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
#### Effective July 1, 2023

| DEPARTMENT | FEE TYPE | PAGE |
|---|---|---|
| **Community Development** | Wastewater Collection System | 17 |
| **-Engineering Division** | Utility Pavement and Sidewalk Cut | 17 |
| | Engineering Permits | 17 |
| | Engineering Site Plan Review | 17 |
| | Document Preparation and Filing Fees | 17 |
| | Notary, Reproduction and Storage of Maps and Plans | 17 |
| | Right-of-Way (ROW) Construction | 18 |
| | Private Property Paving | 18 |
| **Community Development** | Tree Replacement | 19 |
| **-Planning Division** | Planning Commission | 19 |
| | Zoning Board of Appeals | 19 |
| | Sign Ordinance Appeal | 20 |
| | Fence Ordinance Appeal | 20 |
| | Zoning Verification Letter | 20 |
| | Application for Brownfield Redevelopment Plan | 20 |
| | License Agreement Fee | 20 |
| | ROW Closure Application | 20 |
| | Downtown Outdoor Dining | 20 |
| **44th District Court** | Court Fines | 21 |
| **Farmers Market** | Indoor Leases | 22 |
| | Outdoor Leases | 22 |
| | Sunday Market Stall Rental | 22 |
| | Building Rental | 23 |
| | Private Rental | 23 |
| | Kids Party Rental | 23 |
| | Optional Extras | 23 |

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
#### Effective July 1, 2023

| DEPARTMENT | FEE TYPE | PAGE |
|---|---|---|
| **Fire Dept. / Emergency Medical Services (EMS)** | Cardiopulmonary Resuscitation (CPR) Training Classes | 24 |
| | Emergency Medical Services | 24 |
| | Fire Prevention Services | 24-25 |
| **Public Library** | Library Fees | 26 |
| | Prints and Copies | 26 |
| | Miscellaneous | 26 |
| | Auditorium Rental | 26 |
| **Police Department** | False Alarm | 27 |
| | Snow Emergency Parking Exemption | 27 |
| | Precious Metals and Gems Dealer Business License | 27 |
| **Parking** | Parking Structure Rates | 28 |
| | Monthly Parking Permits (structures & lots) | 28 |
| | Annual Residential Permits | 28 |
| | On Street Meter Rental | 28 |
| | Overnight Amtrak Parking Pass | 28 |
| | Valet Parking Services in Central Business District (CBD) | 28 |
| **Recreation** | Recreation Programs | 29 |
| | Gym Rental | 29 |
| | Field Rental | 29 |
| | Pavilion Rental | 29-30 |
| **Senior Center Services** | Coffee Service and Supplies | 31 |
| | Room Rental | 31 |
| **Treasury** | Treasury Fees | 32 |
| **Water Billing** | Water and Sewer Commodity Charge | 32 |
| | Sewer Only Charge | 32 |
| | Billing Administrative Flat Fee | 32 |
| | Service Fees | 32 |

| CITY OF ROYAL OAK |
|---|
| **Master Administrative Fee Schedule** |
| <u>Effective July 1, 2023</u> |
| *(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).* |

## Royal Oak Animal Shelter (ROAS)

| SERVICE | | FEE |
|---|---|---|
| Adoption Fee - sterilization deposit | * | $ 50.00 |
| Adoption Fee - cat | | $ 85.00 |
| Adoption Fee - kitten | | $ 85.00 |
| Adoption Fee - cat / kitten (purebred) | | $ 200.00 |
| Adoption Fee - adult dog | | $ 150.00 |
| Adoption Fee - dog (small breed) | | $ 200.00 |
| Adoption Fee - dog (toy or purebred) | | $ 300.00 |
| Adoption Fee - puppy | | $ 200.00 |
| Stray Boarding Fee - 1st day | | $ 35.00 |
| Stray Boarding Fee - 2nd day | | $ 65.00 |
| Stray Boarding Fee - 3rd day | | $ 90.00 |
| Stray Boarding Fee - 4th day and each additional day | | $ 20.00 |
| Surrender Fee - vetted and sterilized surrender | ** | $ 50.00 |
| Surrender Fee - vetted OR sterilized surrender | ** | $ 100.00 |
| Surrender Fee - unvetted and/or intact surrender | ** | $ 150.00 |

*Sterilization deposit on all intact animals leaving the shelter is required by law. Deposit is refundable once terms of the contract have been satisfied and proof of sterilization is returned within a designated time frame to ROAS.*

*\*\*Surrenders are arranged by appointment only.*

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
#### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

### Assessing Department

| SERVICE | | FEE | |
|---|---|---|---|
| Personnel Property List | | $ | 150.00 |
| Apartment List | | $ | 60.00 |
| Condominium List | | $ | 60.00 |
| Vacant Property List | | $ | 60.00 |
| Commercial Property Records | * | $ | 0.25 |
| Industrial Property Records | * | $ | 0.25 |
| Residential Property Records | * | $ | 0.25 |
| Custom Reports | * | $ | 0.25 |
| Mailing Labels | * | $ | 0.25 |
| Archived Assessment Roll | * | $ | 0.25 |
| Archived Records | ** | $ | 5.00 |
| General Copies | | $ | 1.00 |
| Land Division - one parcel into two | | $ | 300.00 |
| Land Division - one parcel into three | | $ | 400.00 |
| Land Division - one parcel into four | | $ | 500.00 |
| Land Division - one parcel into five or more | | $ | 550.00 |
| Land Division - each additional property after five | | $ | 50.00 |

*Cost is per parcel; $1,500.00 maximum.*

**Cost is per parcel, per year.*

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
#### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## City Clerk

| SERVICE | | FEE |
|---|---|---|

**Freedom of Information Act (FOIA) Requests:**

*Please refer to the City of Royal Oak's website for additional information pertaining to FOIA requests:*

**https://www.romi.gov/1742/Freedom-of-Information-Act-FOIA**

| Service | | Fee |
|---|---|---|
| Voter Information Request (sent in excel format, cost per file) | $ | 20.00 |
| Precinct Maps | | $2.00 each |
| Debit / Credit Card Service Fee | | 3% of the payment amount, $2.95 minimum per transaction |
| Copies | | $0.10 per page |
| Birth / Death Certificates (first copy) | $ | 15.00 |
| Birth / Death Certificates (each additional copy) | $ | 5.00 |
| Dog Licensing Fee - less than 17 months | * | $7.00 / $14.00 |
| Dog Licensing Fee - 18 to 29 months | * | $14.00 / $28.00 |
| Dog Licensing Fee - 30 to 36 months | * | $20.00 / $40.00 |
| Dog Licensing Fee - penalty fee | $ | 20.00 |
| Mark Twain Dog Park Membership: (one year membership) | | |
| Resident Rate | $ | 40.00 |
| Non-Resident Rate | $ | 65.00 |
| key fob (one fob per household; 3 dog maximum) | $ | 10.00 |
| Dangerous Dog Fee | $ | 200.00 |

*Michigan Act 339 of 1919 requires licensing of all dogs 4 months of age and older. Rate doubles without proof of spay / neutering.*

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## City Clerk (continued)

| SERVICE | | FEE |
|---|---|---|

**Applications and Permits:**

| SERVICE | | FEE |
|---|---|---|
| Arts, Beats and Eats (ABE) Parking Station Application | $ | 185.00 |
| ABE Parking Station - premium fee for lots with 50+ spaces | $ | 40.00 |
| ABE Parking Station - late fee | $ | 150.00 |
| Banner Application Permit | $ | 225.00 |
| Application to Film | $ | 12.00 |
| Hotel / Motel Application - one to 10 rooms | $ | 480.00 |
| Hotel / Motel Application - 11 to 1,000 rooms (cost per room) | $ | 17.50 |
| Hotel / Motel Application - late fee | | 25% of the total cost |
| Harbor Livestock / Animal Permit | $ | 20.00 |
| Parking Station Application (first-time applicant) | $ | 150.00 |
| Parking Station - premium fee for lots with 50+ spaces | $ | 40.00 |
| Parking Station - renewal with changes | $ | 150.00 |
| Parking Station - renewal without changes | $ | 20.00 |
| Peddler's License Permit | $ | 50.00 |
| Application to Operate Quadricycle | $ | 125.00 |
| School Parade / Walk Permit Application * | $ | 20.00 |
| Solicitation Application ** | | n/a |

*For school use only, and must be turned in 30 days prior to your event.

**A solicitation application must be on file with the city clerk.

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
#### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## City Clerk (continued)

| SERVICE | FEE |
|---|---|

**Applications and Permits (continued):**

| | | |
|---|---|---|
| Special Event Permit Application Fee | $ | 125.00 |
| Woodward Dream Cruise - new sales permit | $ | 200.00 |
| Woodward Dream Cruise - outdoor sales permit | $ | 200.00 |
| Woodward Dream Cruise - outdoor sales permit with alcohol | $ | 300.00 |
| Woodward Dream Cruise - third-party permit | $ | 200.00 |
| Woodward Dream Cruise - late fee | $ | 200.00 |
| | | |
| Liquor License - non-refundable application investigation fee | $ | 1,000.00 |
| Class C Annual Renewal | $ | 1000.00 |
| Specialty Designated Distributors (SDD) Annual Renewal | $ | 100.00 |
| Specialty Designated Merchants (SDM) Annual Renewal | $ | 100.00 |
| Massage Establishments Annual License Renewal Fee | $ | 1,000.00 |
| Recreational Marijuana Annual License Renewal Fee | $ | 5,000.00 |

**City Commission Chamber Rental:**

| | |
|---|---|
| one hour or less (door attendant / room) | $15.00 / $100.00 |
| more than 1 hour, less than 2 hours (door attendant / room) | $30.00 / $100.00 |
| more than 2 hours, less than 3 hours (door attendant / room) | $45.00 / $100.00 |
| more than 3 hours, less than 4 hours (door attendant / room) | $60.00 / $135.00 |
| more than 4 hours, less than 5 hours (door attendant / room) | $75.00 / $225.00 |

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## Community Development - Building Department

| SERVICE | | FEE |
|---|---|---|
| **Commercial Construction:** | | |
| Plan Review Fee | * | .0015 x construction value |
| Commercial Building Permit Fee - up to $10 million in estimated value of construction or fraction thereof, rounded to the next highest $1,000.00 ($200.00 minimum fee) | | $12.00 per $1,000.00 in construction value |
| Commercial Building Permit Fee - more than $10 million in estimated value of construction or fraction thereof, rounded to the next highest $1,000.00 ($200.00 minimum fee) | | $12.00 per $1,000.00 in value up to $10 million AND $10.00 per $1,000.00 in value over $10 million |
| Builders Deposit ($200.00 minimum fee) | | 1% of construction value |
| Construction Code Board of Appeals Hearings | $ | 375.00 |
| Stop Work | | $625.00 maximum |
| Reinstatement of Expired Permit | | 50% of original fee |
| Wrecking of Buildings permit - up to 30,000 cubic feet | $ | 200.00 |
| Wrecking of Buildings permit - more than 30,000 cubic feet | | $200.00 + $5.00 / 1,000 cu ft or fraction thereof |
| Wrecking cash deposit - accessory structure / all others | | $625.00 / $2,500.00 |
| Temporary Certificate of Occupancy | $ | 625.00 |
| Cancellation / Refund of Fees (70% of original permit fee, less $50.00 administrative fee) upon written request, prior to work starting. | $ | 50.00 |
| Revised / Substitute Plans (fees are based on portion of work redesigned) | | tbd |
| Special Investigation (required when work is started prior to permit issuance, or other situations requiring additional staff time) | | tbd |
| Inspector Meeting (per inspector, per hour) | $ | 75.00 |
| Record Retention (per page) | $ | 1.25 |
| Reinspection Fee / All Other Services | | determined by Building Official |

*\*Cost is computed from the current square foot construction costs of International Code Council (ICC).*
 *Plan review fees must be paid before the plan review process can start.*

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## Community Development - Building Department  (continued)

| SERVICE | | FEE |
|---|---|---|
| **Residential Construction:** | | |
| Plan Review Fee - new home construction | * | $ 450.00 |
| Plan Review Fee - room or dormer addition (up to 400 sq ft) | * | $ 100.00 |
| Plan Review Fee - room or dormer addition (between 401 - 1,000 sq ft) | * | $ 250.00 |
| Plan Review Fee - room or dormer addition (over 1,001 sq ft) | * | $ 425.00 |
| Alterations | | $ 40.00 |
| Residential 1 & 2 Family Building Permit Fee ($100 minimum fee) | ** | $12.00 per $1,000.00 in construction value |
| Builders Deposit - additions / new homes | | $200.00 / $750.00 |
| Construction Code Board of Appeals Hearings | | $ 375.00 |
| Stop Work | | $625.00 maximum |
| Reinstatement of Expired Permit | | 50% of original fee |
| Wrecking of Buildings permit - 1 & 2 family dwellings / garages | | $250.00 / $100.00 |
| Wrecking cash deposit - 1 & 2 family dwellings / garages | | $1,250.00 / $625.00 |
| Temporary Certificate of Occupancy | | $ 625.00 |
| Cancellation / Refund of Fees (70% of original permit fee, less $50.00 administrative fee) upon written request, prior to work starting. | | $ 50.00 |
| Revised / Substitute Plans (fees are based on portion of work redesigned, final costs determined by plan reviewer) | | tbd |
| Special Investigation (required when work is started prior to permit issuance, or other situations requiring additional staff time) | | tbd |
| Inspector Meeting (per inspector, per hour) | | $ 75.00 |
| Record Retention (per page) | | $ 1.25 |
| Reinspection Fee / All Other Services | | determined by Building Official |

*\* Plan review fees must be paid before the plan review process can start. Final plan review fee may be higher than estimated and will be determined by the Building Inspector based upon actual time required. The additional amount, if any, will be due upon completion of the plan review process and before any permits will be issued.*

*\*\*Cost is computed from the current square foot construction costs of International Code Council (ICC).*

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
#### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## Community Development - Building Department  (continued)

| SERVICE | FEE |
|---|---|

### PLUMBING FEE SCHEDULE

NO FEE FOR REGISTRATION.  MINIMUM PERMIT FEE IS $70.00

| Service | Fee |
|---|---|
| Backflow Preventer | $ 30.00 |
| Backwater Check Valve | $ 20.00 |
| Bathtub | $ 15.00 |
| Dishwasher | $ 15.00 |
| Drinking Fountain | $ 15.00 |
| Floor Drain | $ 15.00 |
| Garbage Disposal | $ 20.00 |
| Grease Interceptor | $ 20.00 |
| Interior Drain Tile | $ 35.00 |
| Laundry Tub / Standpipe | $ 15.00 |
| Lavatory / Sink | $ 15.00 |
| Lawn Sprinkling Backflow Preventer | $ 30.00 |
| Medical Gas - per 5 openings | $ 30.00 |
| Pump / Ejector / Sump | $ 25.00 |
| Roof Sump | $ 15.00 |
| Safe Waste | $ 15.00 |
| Shower Trap | $ 15.00 |
| Stack, Conductor, Vent, AAV | $ 20.00 |
| Unlisted Fixture | $ 25.00 |
| Urinal | $ 15.00 |
| Underground Sanitary | $ 25.00 |
| Water Closet (toilet) | $ 15.00 |
| Water Distribution - Per 150 Feet: up to 1-1/4 inch | $ 30.00 |
| Water Distribution - Per 150 Feet: over 1-1/4 inch | $ 60.00 |
| Water Heater | $ 15.00 |

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
#### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## Community Development - Building Department  (continued)

| SERVICE | FEE |
|---|---|

### SEWER FEE SCHEDULE
NO FEE FOR REGISTRATION.  MINIMUM PERMIT FEE IS $70.00

| Service | Fee |
|---|---|
| Manhole / Catch Basin | $ 30.00 |
| Sewer - Per 200 Feet: up to 6" diameter | $ 60.00 |
| Sewer - Per 200 Feet: over 6" diameter | $ 80.00 |
| Sewer Cap | $ 40.00 |
| Sewer Cleanout | $ 30.00 |
| Water Service - from curb box (new or repl.): up to 2" diameter | $ 35.00 |
| Water Service - from curb box (new or repl.): over 2" diameter | $ 40.00 |

### MECHANICAL FEE SCHEDULE
NO FEE FOR REGISTRATION.  MINIMUM PERMIT FEE IS $70.00

| Service | Fee |
|---|---|
| A/C Unit | $ 40.00 |
| Air Handling Unit / Energy Recovery Ventilator | $ 100.00 |
| Boiler | $ 110.00 |
| Chiller | $ 175.00 |
| Chimney Liner or B-Vent | $ 10.00 |
| Damper - Fire, Smoke, or Combination | $ 10.00 |
| Duct Detector (not a part of a fire alarm system) | $ 10.00 |
| Exhaust System | $ 40.00 |
| Fireplace, Fireplace Insert, or Wood Stove | $ 90.00 |
| Furnace | $ 110.00 |
| Gas Piping - per 5 openings | $ 70.00 |
| Generator - Diesel, Natural Gas, or Propane | $ 100.00 |
| Heat Exchanger, Coil, or Variable Air Volume Box | $ 20.00 |
| Heater - Wall, Unit, or Pool | $ 105.00 |

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
#### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## Community Development - Building Department  (continued)

| SERVICE | FEE |
|---|---|

### MECHANICAL FEE SCHEDULE (continued)
NO FEE FOR REGISTRATION.  MINIMUM PERMIT FEE IS $70.00

| Service | | Fee |
|---|---|---|
| Hood - Type 1 | $ | 190.00 |
| Hood - Type 2, Fume, or Lab | $ | 70.00 |
| Humidifier | $ | 10.00 |
| HVAC Ductwork Systems | $ | 110.00 |
| Hydronic / Process Piping - Per 200 Feet | $ | 95.00 |
| Kitchen, Bath, or Dryer Exhausts | $ | 10.00 |
| Package or Rooftop Unit | $ | 100.00 |
| Refrigeration System - New or Alteration | $ | 65.00 |
| Smoke Control System | $ | 220.00 |

### ELECTRICAL PERMIT FEE SCHEDULE
NO FEE FOR REGISTRATION.  MINIMUM PERMIT FEE IS $70.00

| Service | | Fee |
|---|---|---|
| A/C Unit | $ | 55.00 |
| Circuits - New or Altered | $ | 15.00 |
| Emergency Lighting - per 5 fixtures | $ | 65.00 |
| Feeder / Bus Duct - per 100 feet | $ | 25.00 |
| Fire Alarm Panel | $ | 30.00 |
| Fire Alarm Device | $ | 10.00 |
| Fixtures - per 25 fixtures | $ | 25.00 |
| Furnace - New or Reconnect | $ | 35.00 |
| Garage Feeder - Detached Only | $ | 80.00 |
| Generator - up to 30 KVA | $ | 65.00 |
| Generator - between 30 - 50 KVA | $ | 75.00 |
| Generator - greater than 50 KVA | $ | 90.00 |

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
#### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## Community Development - Building Department  (continued)

| SERVICE | FEE |
|---|---|

### ELECTRICAL PERMIT FEE SCHEDULE (continued)
NO FEE FOR REGISTRATION.  MINIMUM PERMIT FEE IS $70.00

| Service | Fee |
|---|---|
| HVAC Package Unit or Rooftop Unit | $ 55.00 |
| Motor - up to 5 HP | $ 30.00 |
| Motor - between 5 - 30 HP | $ 55.00 |
| Motor - greater then 30 HP | $ 80.00 |
| Panel / Sub-Panel - up to 200 Amp | $ 45.00 |
| Panel / Sub-Panel - between 200 - 400 Amp | $ 65.00 |
| Panel / Sub-Panel - greater than 400 Amp | $ 200.00 |
| Parking Lot Lighting - per 5 poles | $ 80.00 |
| Service - New, Relocate, or Repair | $ 45.00 |
| Signs - New or Reconnect | $ 35.00 |
| Smoke Detectors - Residential Hardwired only (per device) | $ 10.00 |
| Solar / Photovoltaic (per Kw) | $ 20.00 |
| Swimming Pool or Spa | $ 55.00 |

*Multiply the total quantity of each item by the unit price for the total fee. It is the responsibility of the applicant to include and state all work being performed on the permit application.*

*A permit remains valid as long as inspections are requested and conducted.*

*A permit shall become invalid if the authorized work has not commenced within six months after issuance of the permit or if the authorized work is suspended or abandoned for a period of six months after the time of commencing work.*

*A permit will be CANCELLED when no inspections are requested and/or conducted within six months of the date of issuance or the date of a previous inspection. Cancelled permits cannot be refunded or reinstated. The permit holder shall schedule all inspections in a timely manner.*

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
#### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## Community Development - Building Department  (continued)

| SERVICE | | FEE |
|---|---|---|
| Rental License: | | |
| Rental License Application Fee - single family | * | $ 145.00 |
| Rental License Application Fee - owner occupied duplex | * | $ 145.00 |
| Rental License Application Fee - duplex | * | $ 230.00 |
| Rental License Application Fee - condominium | * | $ 90.00 |
| Rental License Application Fee - multiple units | * | $230.00 administrative fee + $30.00 per unit |
| Sidewalk Sign Application Fee | | $ 75.00 |
| Fence Permit Application Fee | | $ 35.00 |
| Fence Permit Plan Review Fee | | $ 30.00 |

*Approved by City Commission on 06/27/2022*

## Community Development - Code Enforcement

| SERVICE | | FEE |
|---|---|---|
| Ordinance Enforcement Administration Fee - DPS services | * | $ 35.00 |
| Ordinance Enforcement Administration Fee - Code Enforcement | | $ 75.00 |

*Assessed per visit.*

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
#### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## Community Development - Engineering Division

| SERVICE | FEE |
|---|---|
| **Wastewater Collection System Fees:** | |
| District A | $ 1,733.00 |
| District B | $ 1,980.00 |
| District C | $ 2,660.00 |
| **Utility Pavement and Sidewalk Cut Fees:** | |
| 1st pavement cut - major street (30 sf) | $ 1,183.00 |
| each additional cut - major street (30 sf) | $ 703.00 |
| 1st pavement cut - local street (30 sf) | $ 958.00 |
| each additional cut - local street (30 sf) | $ 680.00 |
| sidewalk cut per flag | $ 428.00 |
| **Engineering Permit Fees:** | |
| Permit Fee (per permit) | $ 130.00 |
| Inspection Fee (per hour) | $ 106.00 |
| Penalty Fee (per violation) | $ 285.00 |
| Contaminated Sewage Discharge Review Fee (per occurrence) | $ 214.00 |
| **Engineering Site Plan Review Fees:** | |
| Review Fee (per hour) | $ 107.00 |
| Easement Preparation / Filing Fee (per easement) | $ 394.00 |
| License Agreement Preparation / Filing Fee (per license agreement) | $ 394.00 |
| Document Preparation / Filing Fee (pull-off parking agreements) | $ 301.00 |
| Document Preparation / Filing Fee (stormwater detention liens) | $ 351.00 |
| Letter-to-serve and Other Official Documentation Service Fee (per letter or document) | $ 200.00 |
| Notary Services (per document) | $ 10.00 |
| Scanning and e-storage (per plan sheet) | $ 2.00 |
| Plan and Map Reproduction Fee (1st copy / each additional) | $20.00 / $5.00 |

Attachment 1

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## Community Development - Engineering Division (continued)

| SERVICE | | FEE |
|---|---|---|

***Engineering Division Performance Guarantee Schedule***
***In the form of cash or an irrevocable letter of credit (ILOC) per permit.***

**Right-of-way (ROW) Construction:**

| | | | |
|---|---|---|---|
| Commercial / Non-resident Work | * | | 125% cost of ROW work |
| Utility Improvement: | * | | 125% cost of ROW work |
| directional boring for up to 2 locations | | $ | 10,000.00 |
| directional boring each additional location | | $ | 5,000.00 |
| New House / Major House Reconstruction:   BUILDER ONLY | ** | | |
| 60ft wide or smaller lots | | $ | 5,000.00 |
| wider than 60ft lot or corner lot | | $ | 7,500.00 |
| Sidewalk and/or Curb Cut Driveway Approach Construction: | | | |
| per permit | | $ | 1,000.00 |
| both permits | | $ | 2,000.00 |
| Sewer / Water Tap or Sewer / Water Line: | | | |
| for work in the roadway | | $ | 2,000.00 |
| for work entirely outside the roadway | | $ | 1,000.00 |
| Traffic Control - Sidewalk, Lane and Road Closures | *** | $ | 2,000.00 |
| Container / Dumpster Placement in ROW | | $ | 2,000.00 |

**Private Property Paving:**

| | |
|---|---|
| Private Property Paving - % cost for proposed work | 20% cost of work |

*\*Percentage of cost for the proposed work in the right-of-way. $1,000.00 minimum fee.*

*\*\*ONLY builders may pull this permit.*

*\*\*\*Per permit; any parking meters blocked must be paid for in advance.*

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
#### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## Community Development - Planning Division

| SERVICE | | FEE |
|---|---|---|
| **Tree Replacement:** | | |
| Evergreen trees | * | $200.00 per foot |
| Large deciduous canopy trees | ** | $200.00 per inch |
| Small deciduous ornamental trees | ** | $180.00 per inch |
| **Planning Commission:** | | |
| Site Plan Review / Review with Public Hearing (optional) | *** | $500.00 / $900.00 |
| Special Land Use (includes site plan review) | *** | $ 1,500.00 |
| Site Plan or Special Land Use Renewal | | $500.00 each |
| Rezoning Request | *** | $ 1,000.00 |
| Conditional Rezoning Request | *** | $ 1,500.00 |
| Special Redevelopment Project | *** | $ 1,500.00 |
| Planned Unit Development (Preliminary / Final) | *** | $1,000.00 each |
| Planned Unit Development (City Commission) | | $ 2,000.00 |
| Special Meeting Requested by Petitioner | ***** | $ 500.00 |
| **Zoning Board of Appeals (ZBA):** | | |
| Variance (Use or Dimensional) | *** | $ 700.00 |
| Administrative Appeal or Interpretation | *** | $ 700.00 |
| Request for reconsideration | **** | $ 500.00 |
| Special Meeting Requested by Petitioner | ***** | $ 500.00 |

*\*Total height of evergreen removed less total height of new evergreen planted.*

*\*\*Total diameter-at-breast-height (d.b.h.) in inches removed, less d.b.h in new trees planted.*

*\*\*\*Requires public hearings and notifications to be provided. Notification will be distributed by the city pursuant to state and local ordinance.*

*\*\*\*\*Fee for reconsideration request only. If reconsideration is granted, a new variance application with an additional $700.00 is required.*

*\*\*\*\*\*Subject to Planning Commission / ZBA availability and approval. Additional Fee.*

Attachment 1

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
#### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## Community Development - Planning Division (continued)

| SERVICE | FEE |
|---|---|
| Sign Ordinance Appeal Application Fee | $ 300.00 |
| Fence Ordinance Appeal Application Fee | $ 300.00 |
| Zoning Verification Letter Application Fee | $ 50.00 |
| Application for Brownfield Redevelopment Authority Plan | $ 500.00 |

**Application for Activities Taking Place in Public Right-of-Way (ROW)**

*Note: The city is currently planning to transition activities taking place in the public right-of-way areas to fall under the responsibility of the engineering division of community development.*

| | | |
|---|---|---|
| License Agreement Fee | * | $ 500.00 |
| Right-of-Way Vacation / Closure Application Fee | | $ 400.00 |

<u>Application for Downtown Outdoor Dining:</u> (located in public ROW only)

| | | |
|---|---|---|
| New License Serving Alcohol | * | $ 750.00 |
| New License NOT Serving Alcohol | * | $ 375.00 |
| Existing License Serving Alcohol | * | $ 600.00 |
| Existing License NOT Serving Alcohol | * | $ 300.00 |
| Outdoor Dining Space (180 sq ft) | * | $ 30.00 |
| Required one-time Performance Bond | ** | $ 200.00 |
| Metered Parking Space Fee (street patio) | *** | $25.00 per day, per space |

*License agreement renewed annually effective on 4/1, expires on 10/31. Open to apply all year, subject to city commission.*

**Due for new applicants only or those with depleted funds. Separate bonds are required for Sidewalk Café and Street Patio, respectively.*

****Only after receiving license approval from city commission.*

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
#### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## 44th District Court

| SERVICE | FEE |
|---|---|

**Court Fines are set by the Chief Judge of the 44th District Court. Please refer to the court's webpage or contact the court directly for the current fine schedule.**

**https://www.romi.gov/904/Court-Judicial-Services**

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
#### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## Royal Oak Farmers Market

| SERVICE | | FEE |
|---|---|---|
| Indoor Leases: | | |
| Fridays - Annual - Standard Stall | * | $ 1,175.00 |
| Fridays - Annual - Premium Stall | * | $ 1,700.00 |
| Fridays - Semi-annual - Standard Stall | * | $ 850.00 |
| Fridays - Semi-annual - Premium Stall | * | $ 1,030.00 |
| Saturdays - Annual - Standard Stall | * | $ 1,700.00 |
| Saturdays - Annual - Premium Stall | * | $ 2,225.00 |
| Saturdays - Semi-annual - Standard Stall | * | $ 925.00 |
| Saturdays - Semi-annual - Premium Stall | * | $ 1,375.00 |
| Saturdays - Daily Vendor - 6' Table | | $ 25.00 |
| Saturdays - Daily Vendor - 6'x8' Space | | $ 40.00 |
| Outdoor Leases: (Saturday only / Semi-annual) | | |
| East or West Porch - Covered | | $ 825.00 |
| East or West Porch - Uncovered | | $ 725.00 |
| South End | | $ 925.00 |
| Sunday Market Stall Rental: (Summer Rate / Winter Rate) | | |
| Wall Space | | $45.00 / $45.00 |
| Center Space | | $50.00 / $50.00 |
| South Wall | | $60.00 / $60.00 |
| Wall Corner | | $45.00 / $45.00 |
| East Porch | | $60.00 / $30.00 |
| West Porch | | $40.00 / $20.00 |
| East Porch - Uncovered | | $40.00 / $20.00 |
| West Porch - Uncovered | | $20.00 / $10.00 |

*Annual lease agreements for weekend producers became effective May 1, 2023 and run through the end of April. Previously approved by City Commission on June 27, 2022.*

Attachment 1

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
#### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## Royal Oak Farmers Market (continued)

| SERVICE | | FEE |
|---|---|---|
| **Building Rental:** | | |
| Sunday through Thursday only, 2 hour minimum / 3 hours max | | $300.00 per hour |
| Cleaning Fee | $ | 200.00 |
| **Private Rentals:** | | |
| Base Fee - Friday and Saturday | * | $3,300 / $3,800 / $4,500 |
| Base Fee - Sunday through Thursday | * | $2,300 / $2,800 / $3,500 |
| Staffing Fee - 1 personnel (0-200 people) | $ | 250.00 |
| Staffing Fee - 2 personnel (201-400 people) | $ | 500.00 |
| Staffing Fee - 3 personnel (401-600 people) | $ | 750.00 |
| Staffing Fee - 4 personnel (600+ people) | $ | 1,000.00 |
| **Kids Party:** *(under 17 years of age)* | | |
| Base Fee - Sunday through Thursday | * | $2,600 / $3,000 / $3,500 |
| Staffing Fee - 2 personnel (up to 400 attendees) | $ | 500.00 |
| Staffing Fee - 3 personnel (401-600 attendees) | $ | 750.00 |
| Staffing Fee - 4 personnel (600+ attendees) | $ | 1,000.00 |
| **Optional Extras:** | | |
| 6' x 32" Rectangle Tables (70 included with rental) | | FREE |
| 60" Round Tables | | $10.00 each |
| 30" x 42" Hi-Top Tables | | $10.00 each |
| Black Stackable Chairs or Black Padded Folding Chairs | | $1.00 each |
| West Porch or East Porch | | $200.00 each |
| West Lot | $ | 500.00 |
| Wedding Rehearsal | $ | 100.00 |
| Masking Curtains - Office Wall only | $ | 400.00 |
| Masking Curtains - Drive Aisle(s) only | | $100.00 each |

*Fees listed correlate to size of rental space to 1st curtain / 2nd curtain /  or full building rental.*

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
#### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## Fire Department / Emergency Medical Services (EMS)

| SERVICE | FEE |
|---|---|
| Cardiopulmonary Resuscitation (CPR) Training Classes | $ 50.00 |
| **Emergency Medical Services:** | |
| Advanced Life Support (ALS) Emergency | $ 700.00 |
| ALS II Emergency | $ 1,000.00 |
| Basic Life Support (BLS) Emergency | $ 600.00 |
| BLS Non-Emergency | $ 375.00 |
| Mileage | $ 15.00 |
| **Fire Prevention Services:** | |
| Emergency Responder Radio Booster | $ 150.00 |
| Fire Alarm - Administrative Fee | $ 150.00 |
| Fire Alarm - Subsequent Plan Review (per hour) | $ 100.00 |
| Fire Alarm - Alarm Control Panel | $ 75.00 |
| Fire Alarm - 1st Initiating Device | $ 15.00 |
| Fire Alarm - Each Additional Initiating Device | $ 3.00 |
| Fire Alarm - 1st Notification Device | $ 15.00 |
| Fire Alarm - Each Additional Initiating Device | $ 3.00 |
| Re-Inspection Fees for Annual Inspections | $ 100.00 |
| New Construction - Fire Alarms Re-Inspections (per hour) | $ 100.00 |
| New Construction - All Types of Re-Inspections (per hour) | $ 100.00 |
| Existing Structures / Occupancies - All Types of Re-Inspections (per hour) | $ 100.00 |
| Kitchen Hood (Commercial) - Admin. Fee; 1st Inspection | $ 150.00 |
| Kitchen Hood (Commercial) - each additional kitchen hood | $ 100.00 |
| Tents - Inspection Fee | $ 25.00 |
| Food Truck - Annual Permit | $ 50.00 |
| Hazardous Material Reporting / Annual Permit | $ 250.00 |

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
#### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## Fire Department / Emergency Medical Services (EMS) (continued)

| SERVICE | FEE |
|---|---|
| **Fire Prevention Services: (continued)** | |
| Sprinkler System / Standpipe System: | |
| Administrative Fee | $ 100.00 |
| Pipe Schedule Plan Review (less than 29 heads) | $ 100.00 |
| Each Fire Pump | $ 175.00 |
| Each Jockey Pump | $ 50.00 |
| 1-20 sprinkler heads | $ 180.00 |
| 21-100 sprinkler heads | $ 360.00 |
| 101-200 sprinkler heads | $ 450.00 |
| 201-300 sprinkler heads | $ 540.00 |
| 301-500 sprinkler heads | $ 720.00 |
| Each Sprinkler Head Over 500 | $ 1.50 |
| Standpipe / Sprinkler Combination | $ 75.00 |
| Fire Department Connection | $ 25.00 |
| Each Standpipe Riser | $ 180.00 |
| Clean Agent Suppression System: | |
| Administrative Fee; 1st inspection (each system) | $ 150.00 |
| Each Additional System (same location) | $ 150.00 |

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
#### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## Royal Oak Public Library (ROPL)

| SERVICE | | FEE |
|---|---|---|
| Library Card - resident (full access) | | FREE |
| Library Card - non-resident | * $ | 100.00 |
| Inter-Library Loan - The Library Network (TLN) | | FREE |
| Inter-Library Loan - MelCat (ROPL card holders) | | FREE |
| Overdue Materials - replacement fee for lost or damaged items | | cost to replace item |
| **Prints & Copies:** | | |
| black and white photo copies and prints (1st 5 copies free) | $ | 0.10 |
| color copies and prints (per page) | $ | 0.25 |
| Facsimile services | | $1.75 for 1st page; $1.00 each additional page |
| International Facsimile Services | | $3.95 for 1st page; $3.45 each additional page |
| **Miscellaneous:** | | |
| ROPL Book Bag | | $4.00 each; or 3 for $10.00 |
| USB Flash drive | $ | 2.00 |
| Headphones or earbuds | $ | 2.00 |
| Button-making Supplies (cost per button) | $ | 0.05 |
| Laminating Sheets (8.5"x11" / 11"x17" or larger) | | $0.25 / $0.50 each |
| **Auditorium Rental:** | | |
| For-profit Entity Rental Fee | | 2 hours for $100.00; $50.00 per hour thereafter |
| Non-profit Entity Rental Fee | | 2 hours for $50.00; $25.00 per hour thereafter |

*\* Non-resident cards provide full access to ROPL services, not other TLN services. Fee is annual.*

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
#### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## Police Department

| SERVICE | | FEE |
|---|---|---|
| False Alarm Fee - (triggered after 3 false alarm occurrences per calendar year) | | $ 50.00 |
| False Alarm Fee - 5th occurrence | | $ 75.00 |
| False Alarm Fee - 6 or more occurrences | | $ 100.00 |
| Snow Emergency Parking Exemption Permit Fee (per vehicle) | * | $ 25.00 |
| Precious Metals and Gems Dealer Business License Application Fee (per licensed establishment) | | $ 50.00 |

*\* Available to residents that do not have a driveway.*

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
### <u>Effective July 1, 2023</u>
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## Parking

| SERVICE | | FEE |
|---|---|---|
| Parking Structure Rates | | 1st 2 hours FREE; $0.75 per hour thereafter |
| <u>Monthly Parking Permits:</u> | | |
| for structures at 110 E. 11 Mile Rd. & 212 Center St.  (per month) | $ | 50.00 |
| for structures at 514 S. Lafayette & 271 S. Lafayette (per month) | $ | 45.00 |
| for P1/P2 lots (per month) | $ | 75.00 |
| for P7 lot (per month) | $ | 45.00 |
| Parking Structure Card (for monthly parking passes) * | $ | 10.00 |
| | | |
| Annual Residential Permits (per household) ** | $ | 25.00 |
| On Street Meter Rental (per day) | $ | 25.00 |
| Overnight Amtrak Parking Pass (per day) | $ | 5.00 |
| | | |
| <u>Valet Parking:</u> (in Central Business District only) | | |
| Initial review fee | $ | 750.00 |
| change of valet service | $ | 50.00 |
| annual review fee | $ | 300.00 |
| one day or special event valet service | $ | 300.00 |
| late fee (Dec. 2-Dec. 14 / Dec. 15-Dec. 31) | | $250.00 / $500.00 |
| performance bond | $ | 350.00 |

*One-time fee.

**One-time fee. Available for select areas.

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## Recreation Department

| SERVICE | FEE |
|---|---|

**Recreation Programs:**

**Please visit the City's website for current offerings of Recreation Programs. Online registration, fees and other recreation department information is available at:**

**https://www.romi.gov/440/Recreation**

| | |
|---|---|
| Recreation Programs - returned check fee | $ 35.00 |
| Recreation Programs - refund processing | $ 10.00 |
| Gym Rental at Jack and Patty Salter Community Center (per hour) | $ 60.00 |

Field Rentals:

| | |
|---|---|
| Baseball / Soccer Field Rental (includes bases and lines) | $ 60.00 |
| Practices (field as-is) | No Charge |
| Memorial Park Practices | $ 125.00 |
| Memorial Park - fields 1 and 2 (per hour) (includes bases, staff lines and lights) | $ 75.00 |
| Memorial Park - field 3 (turf field, includes bases, staff lines and lights) | $200.00 1st game; $150.00 additional game |

Pavilion Rental:

*Note: There are two time slots available per day from 10am - 2pm and 3pm - 7pm for pavilion rentals at the following park locations:*

| | |
|---|---|
| Lawson Park - weekday (resident) | $ 50.00 |
| Lawson Park - weekday (non-resident) | $ 60.00 |
| Lawson Park - weekend (resident) | $ 80.00 |
| Lawson Park - weekend (non-resident) | $ 90.00 |

**CITY OF ROYAL OAK**
**Master Administrative Fee Schedule**
<u>**Effective July 1, 2023**</u>
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes.*
*Updates may be posted in a separate addendum. Please contact the department directly if you have any*
*questions).*

## Recreation Department (continued)

| SERVICE | FEE |
|---|---|
| <u>Pavilion Rental:</u> (continued) | |
| Memorial Park - large weekday (resident) | $ 75.00 |
| Memorial Park - large weekday (non-resident) | $ 100.00 |
| Memorial Park - large weekend (resident) | $ 100.00 |
| Memorial Park - large weekend (non-resident) | $ 125.00 |
| Star Jaycee Park - small two (resident) | $ 25.00 |
| Star Jaycee Park - small two (non-resident) | $ 30.00 |
| Star Jaycee Park - large weekday (resident) | $ 45.00 |
| Star Jaycee Park - large weekday (non-resident) | $ 55.00 |
| Star Jaycee Park - large weekend (resident) | $ 60.00 |
| Star Jaycee Park - large weekend (non-resident) | $ 70.00 |
| VFW Park - large weekday (resident) | $ 45.00 |
| VFW Park - large weekday (non-resident) | $ 55.00 |
| VFW Park - large weekend (resident) | $ 60.00 |
| VFW Park - large weekend (non-resident) | $ 70.00 |
| Normandy Oaks Park - large weekday (resident) | $ 125.00 |
| Normandy Oaks Park - large weekday (non-resident) | $ 175.00 |
| Normandy Oaks Park - large weekend (resident) | $ 150.00 |
| Normandy Oaks Park - large weekend (non-resident) | $ 200.00 |

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
__Effective July 1, 2023__
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## Senior Center Services

| SERVICE | FEE |
|---|---|
| Coffee Service and Supplies - for 30 people | $ 20.00 |
| Coffee Service and Supplies - for 55 people | $ 30.00 |
| Coffee Service and Supplies - for 100 people | $ 35.00 |
| Coffee Service and Supplies - for 150 people | $ 40.00 |
| Coffee Service and Supplies - for 200 people | $ 50.00 |
| Room Rental - security deposit | $ 200.00 |
| Room Rental - Saturday cleaning fee | $ 60.00 |
| Room Rental - room 1 (per hour) | $30.00 / $35.00 with food |
| Room Rental - room 2 (per hour) | $30.00 / $35.00 with food |
| Room Rental - room 3 (per hour) | $40.00 / $45.00 with food |
| Room Rental - room 4/5 (per hour) | $50.00 / $60.00 with food |
| Room Rental - room 6 (per hour) | $45.00 / $55.00 with food |
| Room Rental - room 7 (per hour) | $20.00 / $25.00 with food |
| Room Rental - room 8/9 (per hour) | $45.00 / $55.00 with food |
| Room Rental - outdoor patio | $35.00 flat fee |
| Room Rental - parking lot (per hour) * | $ 75.00 |
| Room Rental - lounge (per hour) | $ 25.00 |
| Room Rental - billiards room (per hour) | $ 25.00 |
| _Optional add-ons available:_ Projector, 75" or 86" Monitor, Cordless Microphone, Mobile Audio System, Amplified Speakers | $10.00 flat fee (per item) |

*Requires responsible party to provide a $1 million insurance policy to indemnify the city for any accidents.*

## CITY OF ROYAL OAK
### Master Administrative Fee Schedule
#### Effective July 1, 2023
*(Note: fees contained herein are subject to periodic changes including additions, deletions and rate changes. Updates may be posted in a separate addendum. Please contact the department directly if you have any questions).*

## Treasury Department

| SERVICE | | FEE |
|---|---|---|
| Tax Payment Partner - export file | | $ 150.00 |
| Water / Sewer / Storm - aged accounts file | | $ 150.00 |
| Check Return for Non-payment | * | $ 35.00 |
| Check Return for Incorrect Bank Number (UTLA) | * | $ 20.00 |
| Duplicate Bill Fee | * | $ 15.00 |
| Overpayment Refund Fee | * | $ 20.00 |
| MORTCOMP File Fee (cost per parcel; $1,500 maximum) | | $ 0.25 |
| BSA.TAX File Fee (cost per parcel; $1,500 maximum) | | $ 0.25 |
| Debit / Credit Card Service Fee | | 3% of the payment amount, $2.95 minimum per transaction |

*Per occurrence.

## Water Billing

| SERVICE | | FEE |
|---|---|---|
| Water and Sewer Commodity Charge | * | $ 13.18 |
| Water and Sewer Commodity Charge - excess usage | ** | $ 15.16 |
| Outside City Water Only Commodity Charge | * | $ 6.72 |
| Outside City Water Only Commodity Charge - excess usage | ** | $ 7.73 |
| Sewer Only Charge (per quarter) | | $ 300.15 |
| Billing Administrative Flat Fee (per billing period) | | $ 16.00 |
| Missed Appointment Fee (for water service) | *** | $ 45.00 |
| Debit and Credit Card Service Fee (per transaction; $400 maximum) | | $ 3.95 |

*For first 20 units per billing period.

**In excess of 20 units per billing period.

***For customer scheduled appointments only.

# EXHIBIT B

*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

---

MICHIGAN ASSOCIATION OF HOME
BUILDERS,

UNPUBLISHED
October 16, 2024
11:56 AM

        Plaintiff-Appellant/Cross-Appellee,

and

ASSOCIATED BUILDERS AND CONTRACTORS
OF MICHIGAN and MICHIGAN PLUMBING
AND MECHANICAL CONTRACTORS
ASSOCIATION,

        Plaintiffs,

v

No.  365166
Oakland Circuit Court
LC No.  2010-115620-CZ

CITY OF TROY,

        Defendant-Appellee/Cross-Appellant.

---

Before:  LETICA, P.J., and BOONSTRA and MARIANI, JJ.

PER CURIAM.

Following a bench trial, plaintiff Michigan Association of Home Builders (MAHB) appeals as of right the judgment in favor of MAHB on its claim under the Stille-DeRossett-Hale Single State Construction Code Act (CCA), MCL 125.1501 *et seq*., and in favor of defendant on MAHB's claim under the Headlee Amendment, Const 1963, art 9, § 31, in this action challenging defendant's Building Department fees.[1]  The trial court granted MAHB's request for declaratory and injunctive relief regarding the calculation of defendant's direct and indirect (or overhead) costs incurred in providing services for which the Building Department fees are imposed.  Defendant has filed a cross-appeal from the same judgment.  We reverse the judgment in favor of defendant

---

[1] The Building Department fees will sometimes be referred to as building inspection fees, building permit fees, building fees, or fees, all meaning the same thing.

on the Headlee Amendment claim and remand for entry of judgment in favor of MAHB on that claim.  In all other respects, we affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

This case was filed in 2010 and has been the subject of two prior appeals, both of which resulted in the issuance of a Michigan Supreme Court opinion.  See *Mich Ass'n of Home Builders v Troy*, 504 Mich 204; 934 NW2d 713 (2019) (*MAHB IV*); *Mich Ass'n of Home Builders v Troy*, 497 Mich 281; 871 NW2d 1 (2015) (*MAHB II*).  In *MAHB IV*, 504 Mich at 208-211, our Supreme Court summarized the underlying factual and procedural history:

> Since 2003, [defendant's] Building Department allegedly had been operating with a yearly deficit which, in the aggregate, amounted to $6,707,216 in 2011.  In July 2010, [defendant] privatized the Building Department by entering into a contract with SAFEbuilt Michigan, Inc. (SAFEbuilt), under which SAFEbuilt assumed the duties of the Building Department.  Under the terms of the contract, SAFEbuilt would receive 80% of the building inspection fees, and [defendant] would retain the remaining 20% of the fees.  The contract also provided that if the fees totaled more than $1,000,000 for any fiscal year, then SAFEbuilt would only receive 75% of the fees and [defendant] would retain 25% of the fees.  [Defendant] has retained over $250,000 in fees every year since 2011, indicating that the fees totaled more than $1,000,000 in each of those years.  While the Building Department operated at a $47,354 deficit in 2011, [defendant] retained $269,483 in fees in 2012, $488,922 in 2013, and $325,512 in 2014.  Over these three years, [defendant] retained $1,083,917 in fees, and by 2016, [defendant] had retained $2,326,061.  [*Id*. at 208-209.]

In December 2010, plaintiffs, MAHB, Associated Builders and Contractors of Michigan (ABCM), and Michigan Plumbing and Mechanical Contractors Association (MPMCA), commenced this action by filing a three-count verified complaint against defendant.  *Id*. at 209.

> Plaintiffs alleged violations of the CCA and the Headlee Amendment, [Const 1963, art 9, § 31] and they sought declaratory and injunctive relief.  They claimed that the building inspection fees generated under [defendant's] contract with SAFEbuilt produced "significant monthly surpluses" that [defendant] used to augment its general fund.  Plaintiffs alleged that this practice violates MCL 125.1522(1) [of the CCA], which requires that fees (1) be reasonable, (2) "be intended to bear a reasonable relation to the cost" of Building Department services, and (3) be used only for operation of the Building Department.  They also claimed that [defendant's] fee practice is unconstitutional under the Headlee Amendment, which prohibits taxation by local units of government without voter approval.  [*Id*.]

"[T]he trial court granted summary disposition to [defendant], ruling that the court did not have jurisdiction over plaintiffs' lawsuit because plaintiffs had failed to exhaust their administrative remedies under MCL 125.1509b before filing their complaint."  *MAHB IV*, 504 Mich at 210.  This Court affirmed the trial court's decision.  *Id*., citing *Mich Ass'n of Home Builders v Troy*, unpublished per curiam opinion of the Court of Appeals, issued March 13, 2014

(Docket No. 313688) (*MAHB I*), rev'd 497 Mich 281 (2015). Plaintiffs applied for leave to appeal in our Supreme Court, and, after hearing oral argument on whether to grant the application or take other peremptory action, our Supreme Court "reversed the lower courts' decisions and held that the administrative procedure referred to in MCL 125.1509b did not apply." *MAHB IV*, 504 Mich at 210, citing *MAHB II*, 497 Mich at 288. Our Supreme Court remanded the case to the trial court for further proceedings. *MAHB IV*, 504 Mich at 210, citing *MAHB II*, 497 Mich at 283.

After additional discovery on remand, the parties filed competing motions for summary disposition. *MAHB IV*, 504 Mich at 210. The trial court granted summary disposition to defendant. *Id*. The court reasoned that defendant's "practice of depositing the fees it had retained into the general fund does not violate MCL 125.1522(1) because that money repaid loans from the general fund that were used to operate the Building Department in times of shortfalls." *Id*. A majority of this Court affirmed the trial court's decision. *Id*., citing *Mich Ass'n of Home Builders v Troy (After Remand)*, unpublished per curiam opinion of the Court of Appeals, issued September 28, 2017 (Docket No. 331708) (*MAHB III*), rev'd 504 Mich 204 (2019). Judge Jansen dissented and would have reversed the trial court's decision because she did not agree with the majority that defendant's practice comported with MCL 125.1522(1). *MAHB III*, unpub op at 1 (JANSEN, J., dissenting).

Plaintiffs applied for leave to appeal in our Supreme Court. *MAHB IV*, 504 Mich at 211. Ultimately, our Supreme Court reversed this Court's decision and remanded the case to the trial court for further proceedings. *Id*. at 207-208, 229.

Our Supreme Court concluded that defendant's "use of building inspection fees for the purpose of satisfying a historical deficit violates the second restriction in MCL 125.1522(1)," i.e., that "the amount of the fee 'shall' be reasonably related to the cost of providing the service." *Id*. at 216, quoting MCL 125.1522(1). And, defendant's "discretion under MCL 125.1522(1) is not unfettered; it is subject to a reasonableness component that ensures payments are related to the costs for building inspection services performed or overhead, not the overall operation of the Building Department." *MAHB IV*, 504 Mich at 219. Therefore, "MCL 125.1522(1) does not envision a 'surplus' baked consistently into the fees." *Id*. However, "exactitude is not required, and occasional and incidental surplus would not run afoul of MCL 125.1522(1)." *Id*. at 219 n 36.

Our Supreme Court stated that there was evidence that defendant "did not intend that the fees charged bear a reasonable relation to the cost of the services performed." *Id*. at 219. Under defendant's contract with SAFEbuilt, defendant "retains at least 20% of the revenue from the building fees but allegedly retains only 8% of that amount to absorb the Building Department's indirect costs." *Id*. According to defendant, "it uses an 8% estimate, which is derived from a study, for indirect costs." *Id*. at 219 n 37.

Our Supreme Court noted that "[e]ven the Court of Appeals majority" in *MAHB III* acknowledged that the reasonableness of a fee would be suspect if it consistently generated revenue that exceeded the cost of the service. *Id*. at 220. The *MAHB III* majority concluded that such excessiveness or unreasonableness had not been demonstrated, but our Supreme Court disagreed. *Id*. Rather, our Supreme Court agreed with Judge Jansen's dissent in *MAHB III* that defendant

"used its [B]uilding [D]epartment fees to raise $269,483 in surplus funds in 2012, $488,922 in 2013, and $325,512 in 2014, for a total of $1,083,917 deposited

directly into [defendant's] general fund over the course of only three years. This 'surplus' is not negligible. Common sense indicates that it is not incidental." [*Id.*, quoting *MAHB III*, unpub op at 2 (JANSEN, J., dissenting).]

Our Supreme Court nonetheless recognized that defendant had "presented some evidence of direct and indirect costs that may be related to the services performed and overhead." *MAHB IV*, 504 Mich at 220. Our Supreme Court concluded that defendant was

> entirely justified in retaining revenue to cover the direct and indirect costs of the services it provides. MCL 125.1522(1) expressly allows [defendant] to establish fees that cover overhead, i.e., indirect costs. But, because there is conflicting evidence in regard to the amount of indirect costs incurred by the Building Department, we remand to the trial court for further proceedings. [*Id.* at 221.]

Although plaintiffs lacked a private cause of action for money damages, a claimed violation of MCL 125.1522(1) could proceed by seeking declaratory and equitable relief. *Id.* at 225-226. That is, "plaintiffs may seek declaratory and injunctive relief to redress present and future violations of MCL 125.1522(1)." *Id.* at 208.

Next, with respect to plaintiffs' Headlee Amendment claim, our Supreme Court explained that "[s]tanding to pursue violations of the Headlee Amendment is given to all taxpayers in the state." *Id.* at 226; see also Const 1963, art 9, § 32 (granting standing to "[a]ny taxpayer of the state" to bring a Headlee Amendment claim). Our Supreme Court concluded that plaintiffs had thus far "failed to provide any record evidence that plaintiffs (or their members for that matter) are taxpayers in the city of Troy and have actually paid the fees beyond the allegations in the complaint and counsel's representation at oral argument that plaintiffs sometimes pay homeowners' building inspection fees." *Id.* at 229. Our Supreme Court was thus unable to determine at that point whether plaintiffs had established standing. *Id.* Our Supreme Court further stated:

> Because we cannot reach the conclusion on this record that plaintiffs are taxpayers, we do not address the unripe constitutional question whether the challenged fees violate the Headlee Amendment, Const 1963, art 9, § 31. Nonetheless, some of plaintiffs' individual members may be able to establish that they are indeed taxpayers. Thus, we remand to allow plaintiffs to establish representational standing to maintain a claim under the Headlee Amendment. [*Id.* at 229 n 58.]

"On remand, the trial court shall allow plaintiffs' members an opportunity to establish representational standing on plaintiffs' behalf." *Id.* at 208.

Following further discovery on remand, plaintiffs moved for summary disposition pursuant to MCR 2.116(C)(10) on both the CCA and Headlee Amendment claims. In response, defendant requested summary disposition in its favor. In a May 25, 2021 opinion and order, the trial court

ruled in favor of MAHB with respect to its standing to pursue a Headlee Amendment claim.[2]  In all other respects, the trial court ruled that neither party was entitled to summary disposition.

The case proceeded to a two-day bench trial held in August 2022.  On February 2, 2023, the trial court issued an opinion granting judgment to MAHB on the CCA claim and judgment to defendant on the Headlee Amendment claim.  Despite the earlier summary disposition ruling that MAHB had standing to pursue its Headlee Amendment claim, the trial court's opinion concluded that MAHB lacked standing.[3]  The court nonetheless stated that, if MAHB had standing to pursue the Headlee Amendment claim, the court would have found that defendant violated the Headlee Amendment.  From this judgment, the parties appeal.

## II.  MAHB'S APPEAL

On appeal, MAHB presents multiple arguments challenging the trial court's bench-trial determination that MAHB lacked standing to pursue its Headlee Amendment claim.  MAHB argues that: summary disposition had already been granted in favor of MAHB on the standing issue; defendant did not timely raise the issue of standing and thus waived the issue; MAHB had standing because its members paid the Building Department fees that constituted improper taxes; there was no legal significance to, or factual basis for, the notion that the fees paid by MAHB's members were passed on to the members' customers; and MAHB's members were not required to be qualified electors of the city of Troy in order to have standing for the purpose of a Headlee Amendment claim.  We are not convinced by MAHB's argument that defendant waived the issue of standing.  We agree with MAHB's remaining arguments regarding standing.

This Court "review[s] a trial court's findings of fact in a bench trial for clear error and its conclusions of law de novo."  *Chelsea Investment Group, LLC v Chelsea*, 288 Mich App 239, 250; 792 NW2d 781 (2010) (citation omitted).  Clear error exists if there is no evidentiary support for a finding or if this Court has a definite and firm conviction that a mistake has occurred.  *Id*. at 251.  "The trial court's findings are given great deference because it is in a better position to examine the facts."  *Id*.  "Whether a party has standing is a question of law that is reviewed de novo."  *MAHB IV*, 504 Mich at 212.

The interpretation or application of a constitutional provision is reviewed de novo as a question of law.  *In re Petition of Muskegon Co Treasurer for Foreclosure*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 363764); slip op at 3-4 (citations omitted), lv pending.  "A primary rule in interpreting a constitutional provision such as the Headlee Amendment is the rule of common understanding."  *MAHB IV*, 504 Mich at 213 (quotation marks, brackets, and citation omitted).  "A constitution is made for the people and by the people.  *The interpretation that should be given it is that which reasonable minds, the great mass of people themselves, would give it*."  *Id*. (quotation marks and citation omitted).  The appellate court "typically discerns the

---

[2] The trial court ruled that ABCM and MPMCA lacked standing, and those plaintiffs are no longer involved in the case.

[3] By the time of the bench trial, the case had an assigned judge different from the judge who decided the summary disposition motion.

common understanding of constitutional text by applying each term's plain meaning at the time of ratification." *Wayne Co v Hathcock*, 471 Mich 445, 468-469; 684 NW2d 765 (2004).

Review of this issue also entails consideration of the trial court's summary disposition ruling regarding standing. A trial court's decision on a motion for summary disposition is reviewed de novo. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019).

> A motion under MCR 2.116(C)(10) . . . tests the *factual sufficiency* of a claim. When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion. A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact. A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ. [*Id*. at 160 (quotation marks and citations omitted).]

This Court's review of a ruling on a motion for summary disposition is limited to the evidence that had been presented to the trial court at the time the motion was decided. *Innovative Adult Foster Care, Inc v Ragin*, 285 Mich App 466, 475-476; 776 NW2d 398 (2009).

In *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 372; 792 NW2d 686 (2010), our Supreme Court explained standing principles:

> We hold that Michigan standing jurisprudence should be restored to a limited, prudential doctrine that is consistent with Michigan's longstanding historical approach to standing. Under this approach, a litigant has standing whenever there is a legal cause of action. Further, whenever a litigant meets the requirements of MCR 2.605, it is sufficient to establish standing to seek a declaratory judgment. Where a cause of action is not provided at law, then a court should, in its discretion, determine whether a litigant has standing. A litigant may have standing in this context if the litigant has a special injury or right, or substantial interest, that will be detrimentally affected in a manner different from the citizenry at large or if the statutory scheme implies that the Legislature intended to confer standing on the litigant.

"[U]nder Michigan law, an organization has standing to advocate for the interests of its members if the members themselves have a sufficient interest." *Id*. at 373 n 21. "[S]tanding is a limited, prudential doctrine, the purpose of which is to assess whether a litigant's interest in the issue is sufficient to ensure sincere and vigorous advocacy." *League of Women Voters of Mich v Secretary of State*, 506 Mich 561, 590; 957 NW2d 731 (2020) (quotation marks and citations omitted). The outset of the case is generally the relevant time period in assessing standing. *Id*.

"Traditionally, a private citizen has no standing to vindicate a public wrong or enforce a public right if he or she has not been injured in a manner that is different from the public at large." *MAHB IV*, 504 Mich at 226. Hence, "under general standing principles, a taxpayer has no standing to challenge the expenditure of public funds if the threatened injury to him or her is no different than that to taxpayers generally." *Id*. However, "[s]tanding to pursue violations of the Headlee Amendment is given to all taxpayers in the state." *Id*. Const 1963, art 9, § 32 provides:

Any taxpayer of the state shall have standing to bring suit in the Michigan State Court of Appeals[4] to enforce the provisions of Sections 25 through 31, inclusive, of this Article and, if the suit is sustained, shall receive from the applicable unit of government his costs incurred in maintaining such suit.

Our Supreme Court has explained:

In enacting the Headlee amendment the voters were concerned with ensuring control of local funding and taxation by the people most affected, the local taxpayers. The Headlee Amendment is the voters' effort to link funding, taxes, and control. Specifically relevant to the case at bar, we [have] held that § 32 is an explicit grant of standing to taxpayers to bring suits under the Headlee Amendment. [*MAHB IV*, 504 Mich at 227 (quotation marks, brackets, ellipsis, and citation omitted).]

In *MAHB IV*, 504 Mich at 229, our Supreme Court noted that plaintiffs in the present case had "failed to provide any record evidence that plaintiffs (or their members for that matter) are taxpayers in the city of Troy and have actually paid the fees beyond the allegations in the complaint and counsel's representation at oral argument that plaintiffs sometimes pay homeowners' building inspection fees." Our Supreme Court was thus unable to conclude at that point that plaintiffs had established standing. *Id*. The Court stated that "some of plaintiffs' individual members may be able to establish that they are indeed taxpayers." *Id*. at 229 n 58. The Court therefore remanded the case to the trial court "to allow plaintiffs to establish representational standing to maintain a claim under the Headlee Amendment." *Id*.

On remand, plaintiffs moved for summary disposition under MCR 2.116(C)(10). Plaintiffs argued that they possessed standing to pursue their Headlee Amendment claim because their members were taxpayers in the city of Troy and had paid fees to defendant's Building Department for building permits and inspection services. Plaintiffs attached affidavits to support this argument. Lee Schwartz's affidavit averred that he was an executive vice president for MAHB. He identified three members of MAHB who were "tax paying entities" and paid Building Department fees to defendant in 2010, the year this lawsuit was filed.

On May 25, 2021, the trial court issued an opinion and order holding, in relevant part, that MAHB had standing to pursue a Headlee Amendment claim. The trial court noted that Schwartz's affidavit attested that three specific members of MAHB paid defendant's building fees in 2010, the year this lawsuit was filed, which was the pertinent time period for standing purposes. The trial court rejected defendant's "pass-through" argument, i.e., that MAHB lacked standing because its members were reimbursed by their customers for the fees. Defendant's argument was premised on a comment by Chief Justice Young during oral argument before our Supreme Court in 2015, but our Supreme Court never adopted that position, and no authority supported it. The trial court stated that such a framework was absurd because it would, for example, deprive a landlord of

---

[4] A Headlee Amendment claim may also be brought in the circuit court, as occurred in the instant case. *Wayne Co Chief Executive v Governor*, 230 Mich App 258, 270; 583 NW2d 512 (1998).

standing to sue over property tax matters merely because the landlord received rent from tenants to cover the cost of the property taxes.  In light of the documentation that MAHB's members paid the building fees, MAHB had standing to pursue a Headlee Amendment claim.  Defendant should not be able to accept the fees from MAHB's members but remain insulated from legal challenge. MAHB "established that it paid the Building Department fees and, in the absence of any authority to the contrary, this [c]ourt holds that [MAHB] therefore has standing to pursue a Headlee Amendment claim."

Despite the trial court's ruling on the standing issue at the summary disposition stage, defendant again raised the standing issue in defendant's trial brief and posttrial brief.  In its February 2, 2023 bench-trial opinion,[5] the trial court noted that MAHB did not present any additional evidence on the standing issue at trial.  According to the trial court, defendant's building official, Salim Omar Huerta, testified that a building contractor may initially pay the fee but that the fee is passed on to the homeowner.  The court stated that the May 25, 2021 summary disposition ruling did not foreclose further consideration of the issue of standing.  The court asserted that standing may be raised at any time and that the burden to establish standing increases over the course of the proceeding.  The court held that because defendant continued to raise the issue of standing, MAHB was required to present evidence at trial on the issue.  Moreover, MAHB was obligated to present evidence at trial that it was a qualified elector and taxpayer in the city of Troy. The court found that MAHB adduced no evidence at trial that its "members have paid [B]uilding [D]epartment fees throughout the pendency of this action."  The trial court was also "troubled" by what it characterized as Huerta's testimony that "the homebuilders pay the building fees but ultimately these fees are passed on to homeowners.  Therefore, the real injury is to the homeowners and not [MAHB] who is merely the 'middleman' for the fees."  The court thus concluded that MAHB "did not establish that its members were taxpayers in the [c]ity of Troy who were injured by [defendant's] building fees."

"[S]tanding is not a jurisdictional issue, and should be raised by one of the parties in order to be put in issue."  *Associated Builders & Contractors of Mich v State Treasurer*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 369314); slip op at 8, lv pending.  This Court has thus rejected the argument " 'that the issue of standing may be raised for the first time on appeal because it pertains to jurisdiction.' "  *Id.*, quoting *In re Pollack Trust*, 309 Mich App 125, 154; 867 NW2d 884 (2015).  A defendant's failure to raise the issue of standing in the first responsive pleading or a motion filed before that pleading results in the waiver of the issue.  *Glen Lake-Crystal River Watershed Riparians v Glen Lake Ass'n*, 264 Mich App 523, 528; 695 NW2d 508 (2004).

We are not convinced by MAHB's argument that defendant waived the standing issue. MAHB says that defendant did not raise the issue of standing and that the issue was first raised by Chief Justice Young during the oral argument before our Supreme Court in 2015.  It is true that defendant did not assert lack of standing in its list of affirmative defenses filed with its answer on January 12, 2011.  However, defendant's answer denied an allegation of the complaint that was pertinent to standing.  In ¶ 6 of their complaint, plaintiffs alleged that they and their members were

---

[5] As noted earlier, the judge who decided the summary disposition motion was not the judge who issued the bench-trial opinion.

injured and that they either absorbed the costs of the building fees or were forced to pass the costs along to their customers, putting plaintiffs and their members at a competitive disadvantage. In its answer, defendant responded to that allegation by stating that "[d]efendant denies the allegation that [p]laintiffs are harmed by [defendant]." Although not an explicit reference to standing, this part of the answer could be viewed as implicating the issue of standing. Moreover, the first document that defendant filed in this case was a December 17, 2010 brief responding to plaintiffs' motion for a preliminary injunction and order to show cause. In that brief, defendant asserted, "No emergency exists and it is very unlikely that the [p]laintiffs will [have] success on the merits, if in fact they even have standing to present this matter to the [c]ourt." Although this was not a direct assertion that plaintiffs lacked standing, this statement suggested that standing was an issue. Overall, we are not convinced that defendant waived the issue of standing.

Also, our Supreme Court in *MAHB IV* remanded the case to the trial court for a resolution of the standing issue. Our Supreme Court stated that, on remand, plaintiffs would be allowed to establish standing. *MAHB IV*, 504 Mich at 229 n 58. Our Supreme Court made no reference to consideration of whether the standing issue had been waived. That is, our Supreme Court indicated that the trial court's task on remand was to determine whether plaintiffs had standing, not whether defendant waived the standing issue. "It is the duty of the lower court or tribunal, on remand, to comply strictly with the mandate of the appellate court." *Glenn v TPI Petroleum, Inc*, 305 Mich App 698, 706; 854 NW2d 509 (2014) (quotation marks and citations omitted). The trial court was thus required to resolve the issue of standing on its own merits rather than deem the issue waived.

In its May 25, 2021 summary disposition opinion and order, the trial court thoroughly analyzed the standing issue and concluded that MAHB "has standing to pursue a Headlee Amendment claim." In support of its motion, MAHB presented Schwartz's affidavit, which attested that three specific members of MAHB paid defendant's building fees in 2010, the year this lawsuit was filed. This affidavit further indicated that many more members paid the fees in subsequent years, up to the time the summary disposition motion was filed, although, as noted, the outset of the case is generally the relevant time period in assessing standing. *League of Women Voters*, 506 Mich at 590. Defendant presented no evidence contesting the averments in Schwartz's affidavit. Therefore, the evidence provided at the summary disposition stage established beyond dispute that MAHB's members paid the fees that were alleged to constitute unlawful taxes under the Headlee Amendment. MAHB thus possessed standing to advocate for the interests of its members because some of the members themselves had a sufficient interest. *Lansing Sch*, 487 Mich at 373 n 21.

The trial court's May 25, 2021 opinion and order also correctly rejected defendant's so-called "pass-through" argument, i.e., the notion that MAHB's members, who were builders, paid the building fees but were reimbursed by their customers, i.e., the homeowners. Defendant's "pass-through" theory was derived from a comment made by Chief Justice Young during the 2015 oral argument in our Supreme Court. But our Supreme Court itself did not adopt that theory, and defendant has cited no authority supporting such a theory. The trial court agreed with MAHB that,

> as an example, such a framework would prevent landlords from ever contesting matters related to property taxes, since tenants pay monthly rent to the landlord that is most certainly meant to cover the cost of the landlords' property taxes. This would mean a property owner would not have standing to sue over property tax

matters—an absurd result.  It is the same here.  If [MAHB's] members are the ones who paid the Building Department fees, they may challenge it under the Headlee Amendment—the [c]ourt sees no reason why [defendant] should be able to accept the builders' money but remain insulated from the builders' legal challenge. [MAHB] has established that it paid the Building Department fees and, in the absence of any authority to the contrary, this [c]ourt holds that [MAHB] therefore has standing to pursue a Headlee Amendment claim.

The trial court's analysis was convincing.  The court correctly rejected defendant's "pass-through" theory and concluded that MAHB possessed standing to pursue its Headlee Amendment claim.

Despite the resolution of the standing issue at the summary disposition stage, the trial court's February 2, 2023 bench-trial opinion revisited the issue and concluded that MAHB lacked standing to pursue its Headlee Amendment claim.  MAHB contends that the trial court was foreclosed from examining the standing issue at the bench trial in light of the earlier summary disposition decision.  We disagree.

The litigation was filed in 2010 and assigned to Oakland Circuit Court Judge Shalina Kumar.  In May 2021, the summary disposition ruling addressing standing was rendered by Judge Kumar.  But, at the time of the bench trial in August 2022, Oakland County Circuit Court Judge David Cohen presided over the matter.  Judge Cohen was not bound by the prior standing decision rendered by Judge Kumar.  A circuit court judge is required to follow published decisions of the Court of Appeals and Michigan Supreme Court.  *People v Hunt*, 171 Mich App 174, 180; 429 NW2d 824 (1998).  "There is no similar requirement that one circuit . . . judge follow the decision of the other."  *Id*.  Rather, a published decision of the Court of Appeals is controlling precedent, MCR 7.215(C)(2), unless our Supreme Court takes other action, *Holland Home v Grand Rapids*, 219 Mich App 384, 394; 557 NW2d 118 (1996).

Although Judge Cohen was not foreclosed from revisiting the issue of standing rendered by the prior circuit judge, we nonetheless question whether the issue of standing was properly presented as an issue to be determined at trial.  Defendant sought neither reconsideration nor an interlocutory appeal of the trial court's May 25, 2021 opinion and order concluding that MAHB possessed standing to pursue its Headlee Amendment claim.  Instead, defendant ignored that ruling and simply presented the issue again, over 14 months later, in its trial brief.  And the trial court did little to refine or define the issues to be determined at trial; instead, in a May 10, 2022 order, the trial court simply directed the parties to file trial briefs two weeks before the scheduled trial date and allowed the parties, in those briefs, to "outlin[e] any and all issues involved in this action." We are left less than convinced that defendant or the trial court properly placed MAHB on notice that it would be required to present evidence at trial, over and above that presented at the summary disposition stage, regarding standing.  In any event, we conclude that the standing decision rendered on summary disposition was correct.  Defendant provided no basis for revisiting the issue at the bench trial.  At trial, defendant did not present evidence or controvert the affidavits submitted by MAHB addressing standing. Judge Cohen expressed concern about the "pass-through" theory; the fact that "the homebuilders pay the building fees but ultimately these fees are passed on to homeowners.  Therefore, the real injury is to the homeowners and not [MAHB] who is merely the 'middleman' for the fees."  However, the testimony addressing "pass-through" was given by Huerta, who acknowledged that he was only speculating about the fees being passed on to

homeowners.  Huerta noted that if a contractor paid the fee, he was unaware of the source or whether it was recouped from the homeowner.  Huerta admitted that he lacked personal knowledge of how the fee payment occurred.  Judge Cohen clearly erred by relying on this speculation.  There was no evidence that the fees paid by MAHB's members were passed on to homeowners.  Also, as discussed earlier, even if such a "pass-through" of costs occurred, the trial court's summary disposition ruling correctly noted the analytical flaws of defendant's novel theory and the lack of authority to support it.

The trial court further erred in its bench-trial opinion by stating that MAHB's standing hinged on whether its members were qualified electors in the city of Troy.  There is no such requirement in order to have standing to pursue a Headlee Amendment claim.  As explained earlier, "[s]tanding to pursue violations of the Headlee Amendment is given to all taxpayers in the state." *MAHB IV*, 504 Mich at 226; Const 1963, art 9, § 32.  Further, our Supreme Court in *MAHB IV* remanded this case to the trial court to determine, *inter alia*, whether some of MAHB's members were taxpayers and whether MAHB thus had representational standing to maintain a claim under the Headlee Amendment.  *MAHB IV*, 504 Mich at 229 n 58.  As the trial court correctly ruled at the summary disposition stage, some of MAHB's members paid the fees alleged to constitute unlawful taxes and thus qualified as taxpayers entitled to pursue a Headlee Amendment claim.

In concluding that MAHB's members were required to be qualified electors in order to have standing, the trial court's bench-trial opinion relied on another provision of the Headlee Amendment, Const 1963, art 9, § 31, which states, in relevant part:

> Units of Local Government are hereby prohibited from levying any tax not authorized by law or charter when this section is ratified or from increasing the rate of an existing tax above that rate authorized by law or charter when this section is ratified, without the approval of a majority of the qualified electors of that unit of Local Government voting thereon.

However, this provision does not address standing.  It does not state that only qualified electors have standing to bring a Headlee Amendment claim.  Rather, it provides that a new tax or tax increase may not be imposed without the approval of a majority of the qualified electors.  This does not alter the fact that Const 1963, art 9, § 32 grants standing to all taxpayers in the state.

The trial court stated that these two constitutional provisions must be read together and that a liberal construction in favor of defendant was required by Const 1963, art 7, § 34, which provides, in relevant part, "The provisions of this constitution and law concerning counties, townships, cities and villages shall be liberally construed in their favor."  But the meaning of Const 1963, art 9, § 32 is plain.  It unambiguously grants standing to taxpayers and does not refer to qualified electors.  See *Hathcock*, 471 Mich at 468-469 ("This Court typically discerns the common understanding of constitutional text by applying each term's plain meaning at the time of ratification.").  There is no need for construction, liberal or otherwise, to discern the meaning of the language of Const 1963, art 9, § 32.  See *AFP Specialties, Inc v Vereyken*, 303 Mich App 497, 505; 844 NW2d 470 (2014) (a liberal-construction rule was inapplicable because the statutory provision at issue was unambiguous and thus "need[ed] no construction, liberal or otherwise, to determine its meaning."); *Riverview v Sibley Limestone*, 270 Mich App 627, 631; 716 NW2d 615 (2006) (noting that "[l]aws concerning a city must be liberally construed in its favor" under Const

1963, art 7, § 34, but that "the primary purpose of statutory interpretation is to give effect to legislative intent," which is determined by the statutory language if it is unambiguous). The trial court's imposition of a "qualified elector" requirement for standing contravened the clear text of Const 1963, art 9, § 32.

Accordingly, we agree with MAHB that it possessed standing to pursue its Headlee Amendment claim. The trial court erred in its bench-trial opinion in concluding that MAHB lacked standing on that claim. Moreover, the trial court determined that, if MAHB had standing, its Headlee Amendment claim would succeed on the merits, i.e., that defendant violated the Headlee Amendment because its building fees were unlawful taxes. As will be explained, the trial court did not err in that determination. We thus reverse the judgment for defendant on the Headlee Amendment claim and remand for entry of judgment in favor of MAHB on that claim.

Defendant asserts an alternative ground for affirming the judgment in its favor on the Headlee Amendment claim. Defendant argues that the trial court erred in finding that, if MAHB had standing, its Headlee Amendment claim would succeed on the merits. We disagree with defendant's argument.

"There is no bright-line test for distinguishing between a valid user fee and a tax that violates the Headlee Amendment." *Bolt v Lansing*, 459 Mich 152, 160; 587 NW2d 264 (1998). "In general, 'a fee is exchanged for a service rendered or a benefit conferred, and some reasonable relationship exists between the amount of the fee and the value of the service or benefit. A tax, on the other hand, is designed to raise revenue.' " *Shaw v Dearborn*, 329 Mich App 640, 653; 944 NW2d 153 (2019), quoting *Bolt*, 459 Mich at 161.

> Under *Bolt*, courts apply three key criteria when distinguishing between a user fee and a tax: (1) "a user fee must serve a regulatory purpose rather than a revenue-raising purpose"; (2) "user fees must be proportionate to the necessary costs of the service"; and (3) a user fee is voluntary in that users are "able to refuse or limit their use of the commodity or service." [*Shaw*, 329 Mich App at 653, quoting *Bolt*, 459 Mich at 161-162.]

"These criteria are not to be considered in isolation, but rather in their totality, such that a weakness in one area would not necessarily mandate a finding that the charge is not a fee." *Shaw*, 329 Mich App at 653 (quotation marks and citation omitted).

"A fee charged by a municipality is presumed reasonable unless it is facially or evidently so wholly out of proportion to the expense involved that it must be held to be a mere guise or subterfuge to obtain the increased revenue." *Id*. at 654 (quotation marks and citation omitted). This presumption of reasonableness is pertinent to the second *Bolt* factor regarding the proportionality of a charge imposed by a city. *Id*. This presumption can be overcome by presenting sufficient evidence to the contrary. *Id*. at 654-655.

In its bench-trial opinion, the trial court analyzed the merits of the Headlee Amendment claim by applying the *Bolt* test. The court concluded:

If [MAHB] had established standing at trial, the [c]ourt would have found a violation of the Headlee Amendment because the [c]ourt finds there was not proportionality between the fees and cost of services, therefore creating an unauthorized surplus that was revenue generating. Further, the [c]ourt finds that [the] fees were not voluntary. Homeowners did not have a choice about the use of building services to carry out necessary repairs. If a homeowner chose not to do a repair, he risked making his property uninhabitable.

The trial court did not err in its application of the *Bolt* test. The first two *Bolt* factors are closely related and may be analyzed together. *Graham v Kochville Twp*, 236 Mich App 141, 151; 599 NW2d 793 (1999). Evidence supported the trial court's finding that there was a lack of proportionality between the fees and the cost of services and that this generated revenue in the form of an unauthorized surplus. In 2010, defendant privatized its Building Department by entering into a contract with SAFEbuilt. Under that contract, defendant retained 20% to 25% of the Building Department fees. Defendant's own financial records revealed that, following the privatization of the Building Department, defendant consistently generated significant surplus fees every year from 2012 to 2019, resulting in a total surplus of more than $3.2 million for that time period. This indicates that the excessive portion of the fees served a revenue-raising purpose and that there was a lack of proportionality between the amount of the fees and the cost of service. This conclusion is supported by the testimony of Patrick Anderson, MAHB's expert on economics, public finance, and the Headlee Amendment. Anderson opined that consistently raising revenue to such an extent indicated a revenue-raising purpose and that the excessive portion of the fees that contributed to a surplus qualified as a tax.

Further, Anderson concluded that defendant was blatantly misrepresenting its building inspection costs for the 2019-2020 and 2020-2021 fiscal years. Defendant was including costs from other city departments, even when those departments received separate fees for the relevant activity, thereby engaging in what Anderson viewed as an impermissible "double dip." Anderson viewed it as inappropriate to charge a building inspection fee to pay for services performed by departments other than the Building Department. From reviewing the city budgets and the Comprehensive Annual Financial Reports (CAFRs), Anderson determined that there were internal inconsistencies in the CAFRs and that defendant was earning more in fees than the amount of its actual costs each year. Anderson believed this could explain why defendant was changing its manner of determining costs; defendant was claiming to have lost money in performing building inspection services. Defendant was improperly counting more than $400,000 in costs from other departments as direct costs of the Building Department and then calculating indirect costs as a percentage of the alleged direct costs. Anderson stated that defendant was engaging in a "triple dip" by counting as indirect costs a percentage of alleged direct costs from other departments for which defendant collected a separate fee.

Anderson thus believed that defendant collected excessive fees that bore no relationship to the costs of the Building Department. He opined that these excessive fees deposited into the general fund constituted an unauthorized tax that violated the Headlee Amendment.

The trial court found that Anderson testified in a credible and forthright manner and that his testimony was persuasive. This Court "give[s] deference to the trial court's superior ability to

-13-

judge the credibility of the witnesses who appeared before it." *Glen Lake-Crystal River Watershed Riparians*, 264 Mich App at 531 (quotation marks and citations omitted).

The trial court's findings regarding the first two *Bolt* factors were consistent with its findings on the CCA claim. The court found that defendant "increased its direct costs using 'costs' not envisioned by the CCA. These newly designated 'direct costs' escalated the indirect costs proportionately. [Defendant] used this analysis to continue to justify retaining surplus funds." Defendant's "financial reports clearly show that the actual costs of their [B]uilding [D]epartment fell under budget for calendar [sic: fiscal] years ending in 2020 and 2021. The [c]ourt agrees with Mr. Anderson's testimony that [defendant] can only charge for building code work and that other city departments are not performing such work." The court also agreed with Anderson that defendant could not "double dip and charge for services that have separate fees such as [Freedom of Information Act (FOIA), MCL 15.231 *et seq.*] requests, multifamily property inspections, soil erosion and sidewalk permits and [F]ire [D]epartment inspections. [Defendant] also cannot charge for services provided by the [c]ity [c]lerk and [t]reasurer as these are constitutionally mandated offices."

Overall, the evidence at trial supported the trial court's findings regarding the first two *Bolt* factors. The trial court did not err in finding a lack of "proportionality between the fees and cost of services, therefore creating an unauthorized surplus that was revenue generating."

Nor did the trial court err in its finding regarding the third *Bolt* factor, i.e., whether the fees were voluntary. The trial court found "that [the] fees were not voluntary. Homeowners did not have a choice about the use of building services to carry out necessary repairs. If a homeowner chose not to do a repair, he risked making his property uninhabitable."

Our Supreme Court has rejected the proposition

that property owners can control the amount of the fee they pay by building less on their property. . . . [W]e do not find that this is a legitimate method for controlling the amount of the fee because it is tantamount to requiring property owners to relinquish their rights of ownership to their property by declining to build on the property. [*Bolt*, 459 Mich at 168.]

Moreover, the testimony of defendant's building official, Huerta, supported the trial court's finding on this factor. Huerta agreed that a building permit is required if a furnace or electric water heater fails and must be replaced. If water pipes break and must be replaced, a building permit is required in some instances. If an upstairs washing machine breaks and leaks water, a building permit is required to replace rotting floor and ceiling. Payment of a building permit fee is not voluntary if an incident occurs that requires such work. The trial court aptly noted that a homeowner would risk making their property uninhabitable by declining to perform necessary repairs. Overall, the court did not err in its finding on this factor.

Accordingly, the trial court properly found that the application of the *Bolt* factors leads to the conclusion that the building fee constituted a tax and that defendant therefore violated the Headlee Amendment. Because MAHB had standing to pursue its Headlee Amendment claim and

the trial court correctly found a violation of the Headlee Amendment, we reverse the judgment for defendant and remand for entry of judgment in MAHB's favor on this claim.

### III.  DEFENDANT'S CROSS-APPEAL

Defendant first argues on cross-appeal that the trial court erred in denying the request for summary disposition in its favor on the CCA claim.  Specifically, defendant asserts that it presented sufficient evidence to support a ruling in its favor on the CCA claim and that the judiciary lacks authority to review the discretionary action of its City Council in setting the fee amounts.  We disagree.[6]

A trial court's decision on a motion for summary disposition is reviewed de novo.  *El-Khalil*, 504 Mich at 159.  MAHB moved for summary disposition under MCR 2.116(C)(10).  In response, defendant requested summary disposition in its favor pursuant to MCR 2.116(I)(2).  "If, after careful review of the evidence, it appears to the trial court that there is no genuine issue of material fact and the opposing party is entitled to judgment as a matter of law, then summary disposition is properly granted under MCR 2.116(I)(2)."  *Lockwood v Ellington Twp*, 323 Mich App 392, 401; 917 NW2d 413 (2018) (citation omitted).  This Court considers de novo whether the judiciary has constitutional and statutory authority to review a municipal decision.  See *Warda v Flushing City Council*, 472 Mich 326, 330; 696 NW2d 671 (2005) (citations omitted).

MCL 125.1522(1) states:

The legislative body of a governmental subdivision shall establish reasonable fees to be charged by the governmental subdivision for acts and services performed by the enforcing agency or construction board of appeals under this act, which fees shall be intended to bear a reasonable relation to the cost, including overhead, to the governmental subdivision of the acts and services, including, without limitation, those services and acts as, in case of an enforcing agency, issuance of building permits, examination of plans and specifications, inspection of construction undertaken pursuant to a building permit, and the issuance of certificates of use and occupancy, and, in case of a board of appeals, hearing appeals in accordance with this act.  The enforcing agency shall collect the fees established under this subsection.  The legislative body of a governmental subdivision shall only use fees

---

[6] Defendant's principal brief on cross-appeal also asserts that MAHB's remedy was to present its position to its City Council or to submit an inquiry to the Michigan Department of Treasury.  In its brief on cross-appeal, MAHB interprets this argument to mean that MAHB failed to exhaust its administrative remedies.  MAHB argues in response that our Supreme Court ruled in 2015 that MAHB was not required to exhaust administrative remedies before filing this lawsuit, see *MAHB II*, 497 Mich at 288, and ruled in 2019 that MAHB had a private cause of action for declaratory and injunctive relief to redress violations of the CCA, see *MAHB IV*, 504 Mich at 225-226.  In its reply brief, defendant expressly states that it is *not* making an exhaustion-of-administrative-remedies argument.  In light of defendant's clarification in its reply brief that it is not making such an argument, we will not address exhaustion of administrative remedies.

generated under this section for the operation of the enforcing agency or the construction board of appeals, or both, and shall not use the fees for any other purpose.

In *MAHB IV*, 504 Mich at 216, our Supreme Court explained:

The parties agree that MCL 125.1522(1) places three restrictions on a municipality's authority to establish fees under the CCA. One—the amount of the fee "shall" be reasonable. Two—the amount of the fee "shall" be reasonably related to the cost of providing the service. And three—the fees collected "shall" only be used for the operation of the enforcing agency or the construction board of appeals, or both, and "shall" not be used for any other purpose.

Our Supreme Court noted that defendant's "discretion under MCL 125.1522(1) is not unfettered; it is subject to a reasonableness component that ensures payments are related to the costs for building inspection services performed or overhead, not the overall operation of the Building Department." *MAHB IV*, 504 Mich at 219. "MCL 125.1522(1) does not envision a 'surplus' baked consistently into the fees." *MAHB IV*, 504 Mich at 219. But defendant is permitted to retain "revenue to cover the direct and indirect costs of the services it provides." *Id*. at 221. The Court agreed with defendant that "there is no mandate to set fees that exactly match the expenditures, especially since the fee setting process can only be a best estimate of what the future revenue and expenses will be in the coming year." *Id*. at 222 (quotation marks omitted). "MCL 125.1522(1) requires only that the 'fees shall be *intended* to bear a reasonable relation to the cost, including overhead.' Exactitude is not required." *MAHB IV*, 504 Mich at 222. Our Supreme Court remanded the case to the trial court for further findings on the amount of costs. *Id*.

The trial court correctly determined that a genuine issue of material fact existed regarding whether defendant violated the CCA. Defendant suggests that its evidence, including an affidavit of its Chief Financial Officer (CFO), Rob Maleszyk, provided "a sufficient basis to rule in [defendant's] favor" on the CCA claim. But there was conflicting evidence at the summary disposition stage regarding the amount of defendant's indirect costs in the 2018-2019 fiscal year. Indeed, defendant itself repeatedly altered its methodology for determining costs following our Supreme Court's decision in *MAHB IV*. MAHB's position regarding the amount of indirect costs was supported by the affidavit and report of its expert, Anderson.[7] The trial court aptly noted the parties' widely varying calculations of indirect costs. The trial court found it troubling that defendant at one point used a methodology to arrive at $780,728.86 in indirect costs, which was roughly four times the amount of its original calculation, after our Supreme Court ruled in *MAHB IV* that defendant had accumulated an unlawful surplus. See *MAHB IV*, 504 Mich at 220. Also, the trial court found it concerning that defendant "did not include this new analysis in its

---

[7] Defendant notes that Anderson lacked municipal finance experience, but it provides no basis to question Anderson's expertise in economics, public finance, and the Headlee Amendment. Any gaps or weaknesses in a witness's expertise affects the weight of the witness's testimony, not its admissibility; and, it is generally for the trier of fact to decide the extent of a witness's expertise. *Surman v Surman*, 277 Mich App 287, 309-310; 745 NW2d 802 (2007).

[2019- ]2020 CAFR, instead reverting to its old methodology while arguing something different in this [c]ourt."

The conflicting evidence precluded a grant of summary disposition to either party on the CCA claim.  Summary disposition is improper when the evidence is conflicting.  *Patrick v Turkelson*, 322 Mich App 595, 605; 913 NW2d 369 (2018) (citation omitted).  "A trial court may not weigh evidence when ruling on a summary disposition motion, or make credibility determinations."  *Bank of America, NA v Fidelity Nat'l Title Ins Co*, 316 Mich App 480, 512; 892 NW2d 467 (2016) (citations omitted).  "It is for the trier of fact to assess credibility . . . ."  *Id.*

We also reject defendant's argument that the judiciary lacks authority to review the discretionary action of its City Council in determining the fee amounts.  Defendant cites *Warda* for the proposition that the judiciary is precluded from reviewing the discretionary action of a legislative body.  Defendant's reliance on *Warda* is misplaced.

In *Warda*, 472 Mich at 329-330, our Supreme Court considered whether a municipality's decision to deny a police officer's request for reimbursement of attorney fees under MCL 691.1408(2) was subject to judicial review.  The Court noted that the statute used the word "may," which indicated "that the decision to pay an officer's attorney fees is a matter left to the discretion of the municipality."  *Warda*, 472 Mich at 332.  The Court further observed "that the statute does not limit or qualify the word 'may' (with, for instance, a requirement of reasonableness) or provide any other standards by which that discretion is to be exercised."  *Id.*  Hence, the municipal defendant's "city council had full discretion under MCL 691.1408(2) in choosing whether to reimburse plaintiff's attorney fees."  *Warda*, 472 Mich at 332.

> While the statute affords the city council the discretion to decide whether to reimburse a claim for attorney fees, the statute says nothing about the limits within which that discretion is to be exercised, let alone by which an appellate court would be guided in its review of a decision made pursuant to that discretion.  As such, the Flushing city council's action to deny reimbursement of attorney fees is conclusive. [*Id.* at 333.]

"[B]ecause the statute provides no limits within which the city council's discretion is to be exercised, let alone by which an appellate court would be guided in its review of an exercise of that discretion, MCL 691.1408(2) affords plaintiff no basis for relief."  *Warda*, 472 Mich at 335.  In sum, "a judicially comprehensible standard is required in order to enable judicial review.  Here, there is no such standard."  *Id.* at 339.

In contrast to the statute at issue in *Warda*, MCL 125.1522(1) provides judicially comprehensible standards to guide the judiciary in reviewing the discretionary municipal determination of the amount of building fees.  Our Supreme Court in *MAHB IV* explained that three restrictions were placed on a municipality's authority to enact CCA fees—a reasonable amount, a reasonable relationship to the cost of providing the service, and the fees shall only be used for the operation of the enforcement agency.  *MAHB IV*, 504 Mich at 216.  And, this reasonableness component stated in MCL 125.1522(1) was not unfettered but must bear a relationship to the costs of building inspection services.  *MAHB IV*, 504 Mich at 219.  Hence,

MCL 125.1522(1) provides criteria for the judiciary to apply that were found to be lacking in the statute at issue in *Warda*. Judicial review is thus permitted in the instant case.

Defendant next argues on cross-appeal that it was entitled to summary disposition regarding whether MAHB had standing to pursue its Headlee Amendment claim. This issue was already addressed in the context of MAHB's appeal. As explained earlier, the trial court at the summary disposition stage properly ruled in favor of MAHB on the standing issue. Defendant presents no argument on cross-appeal that was not already considered earlier. We thus reject defendant's argument that it was entitled to summary disposition on the standing issue.

Defendant further argues that it was entitled to summary disposition on the merits of MAHB's Headlee Amendment claim. We disagree.

The pertinent legal principles regarding a Headlee Amendment claim, including the *Bolt* factors, were summarized earlier. The trial court ruled that summary disposition on the merits was inappropriate. The court stated that "whether the Headlee Amendment has been violated necessarily relies on the amount of surplus [defendant] has received," and, "given that there exists a question of fact as to the amount of indirect costs associated with Building Department functions," there were questions of fact regarding the first two *Bolt* factors, i.e., "the purpose and proportionality of Building Department fees under a Headlee framework."

The trial court provided a more detailed analysis in support of this conclusion:

> In the instant case, because there is an open question of fact concerning the amount of indirect costs associated with Building Department functions, with the parties presenting very different figures and calculations for these indirect costs— and therefore, the amount of surplus [defendant] has received—the [c]ourt cannot yet make a determination concerning whether the fees are regulatory or revenue-raising, or whether the fees are proportional to the costs of the service. Of course, the [Michigan] Supreme Court already held "that the use of the revenue generated by [defendant's] building inspection fees to pay the Building Department's budgetary shortfalls in previous years violates MCL 125.1522(1) because it is not reasonably related to the cost of acts and services provided by the Building Department." [*MAHB IV*], 504 Mich at 229. While this holding applied only to the CCA claim, there is good reason to believe it may also apply to [MAHB's] Headlee Amendment claim. However, the [Michigan] Supreme Court also held that [defendant] was within its lawful rights to recoup its indirect costs. *Id*. at 221. If the trier of fact does ultimately conclude that the proper indirect costs for 2019 are $4,227, that may very well yield a substantially different outcome under the *Bolt* criteria [than] indirect costs in the amount of $187,636 or $780,728.86, as a smaller amount of indirect costs may make it more likely that the fees are not proportional to the costs and that [defendant's] true purpose was to raise revenue. . . .

Therefore, given the existence of this factual dispute, the court concluded that summary disposition on the merits of the Headlee Amendment claim was inappropriate.

The trial court's reasoning was sound. The parties presented widely varying calculations and figures for the amount of indirect costs, ranging from $4,227 to $780,728.86. The amount of indirect costs was pertinent to the extent of defendant's surplus. Resolution of this factual question was critical to an evaluation of the first two *Bolt* factors, i.e., whether the fees served a regulatory or revenue-raising purpose and whether the fees were proportionate to the necessary costs of the service. *Bolt*, 459 Mich at 161-162; *Shaw*, 329 Mich App at 653. The trial court therefore properly declined to grant summary disposition to either party on the merits of the Headlee Amendment claim.

Defendant next argues on cross-appeal that the trial court erred in its bench-trial determination that defendant violated the CCA. Defendant reasons that its expenses exceeded revenue in the 2019-2020 and 2020-2021 fiscal years and that its building permit fees were not disproportionately high. Defendant challenges the trial court's view that it could not include costs incurred by departments other than the Building Department. Defendant contends that registration under the Skilled Trades Regulation Act (STRA), MCL 339.5901 *et seq*., was not required for all employees who perform Building Department services and that SAFEbuilt was contractually required to work with other city departments. Defendant further argues that MAHB's CCA claim is moot because defendant terminated its contract with SAFEbuilt. Defendant's arguments are unavailing.

This Court "review[s] a trial court's findings of fact in a bench trial for clear error and its conclusions of law de novo." *Chelsea Investment Group*, 288 Mich App at 250. Clear error exists if there is no evidentiary support for a finding or if this Court has a definite and firm conviction that a mistake has occurred. *Id*. at 251 (citation omitted). "The trial court's findings are given great deference because it is in a better position to examine the facts." *Id*. This Court reviews de novo whether an issue is moot. *Garrett v Washington*, 314 Mich App 436, 449; 886 NW2d 762 (2016).

In *MAHB IV*, 504 Mich at 216, our Supreme Court explained the three mandatory restrictions that limited a municipality's authority to establish CCA fees, including fee reasonableness, the fee amount reasonably related to the service cost, and the fee collected to solely be used for the operation of the enforcing agency. This reasonableness component was designed to ensure that the payments bore a relationship to building inspection services or overhead, not to fund the entire Building Department operation. *Id*. at 219.

Defendant's argument that its costs exceeded its revenue for the 2019-2020 and 2020-2021 fiscal years hinges on the inclusion of costs incurred by departments other than the Building Department. However, the trial court correctly concluded that it was inappropriate for defendant to include such costs. In support of this conclusion, the trial court accurately summarized relevant provisions of the CCA.

In particular, under the CCA, a unit of local government like defendant may choose to administer and enforce the Michigan building code. MCL 125.1508a(2); MCL 125.1508b(1). The local government shall designate an "enforcing agency" within the governmental unit to carry out the administration and enforcement of the building code. MCL 125.1508b(2); MCL 125.1502a(t). The enforcing agency is subject to the approval of the State Construction Code Commission. MCL 125.1508a(5); MCL 125.1508b(6). The local government is required to certify "that the

-19-

enforcing agency is qualified by experience or training to administer and enforce the code and all related acts and rules, that agency personnel are provided as necessary, administrative services are provided, plan review services are provided, and timely field inspection services shall be provided."  MCL 125.1508a(5); see also MCL 125.1508b(6) (containing similar language).[8]

MCL 339.6021(1), a provision of the STRA, provides that, "[s]ubject to subsection (2), an individual shall not be appointed or employed as a building official, inspector, or plan reviewer by an enforcing agency, unless the individual is registered under this article and the rules promulgated under this article."   MCL 339.6021(2) states, "[a]n individual who becomes employed by a governmental subdivision as a building official, plan reviewer, or inspector, if not already registered, shall within 30 days of employment apply to the [State Construction Code Commission] for provisional registration."

Upon certification by the State Construction Code Commission, it is the enforcing agency that has authority to administer and enforce the building code.  MCL 125.1522(1) refers to acts and services performed by the enforcing agency.  Those acts and services of an enforcing agency include "issuance of building permits, examination of plans and specifications, inspection of construction undertaken pursuant to a building permit, and the issuance of certificates of use and occupancy . . . ."  MCL 125.1522(1).

Defendant's CFO, Maleszyk, testified that he understood that, under the CCA, building services are to be provided by the enforcing agency.  Maleszyk further indicated that he understood that the enforcing agency in this case is defendant's Building Department.

Defendant's building official, Huerta, likewise testified that he understood that, under the CCA, building services are to be provided by the enforcing agency.  Huerta further agreed that MCL 125.1522(1) contained a list of activities that could only be performed by the enforcing agency, and Huerta agreed that those activities included issuance of building permits, examination of plans and specifications, inspection of construction undertaken pursuant to a building permit, and issuance of certificates of use and occupancy.  Huerta further agreed that the enforcing agency in this case is defendant's Building Department.  Huerta understood that STRA registration was required for city employees who performed work as an inspector or plan reviewer.  He agreed that

---

[8] The approval and certification requirements of MCL 125.1508a(5) and MCL 125.1508b(6) apply when a unit of local government did not enforce the building code before the effective date of the CCA, i.e., December 28, 1999, and when the local government has elected to undertake such enforcement after that date.  The parties do not address any implications in the present case of this temporal aspect of these provisions.  Defendant does not present any argument disputing the applicability of these provisions in this case, even though the trial court cited the provisions.  In any event, these provisions are not critical to the resolution of this case.  As will be discussed later, defendant's own witnesses acknowledged that building services are to be provided by the enforcing agency, which they concede is defendant's Building Department, and there was ample evidence to support the trial court's determination that defendant violated MCL 125.1522(1).

none of the employees from other city departments who performed Building Department services had STRA registration.

MAHB's expert, Anderson, testified that estimating indirect costs as a percentage of costs that are not direct costs of the Building Department is unreasonable and constitutes "double dipping." He explained that, under the CCA and a guidance memorandum from the Michigan Department of Treasury, direct costs are costs of the enforcing agency, i.e., the Building Department. Costs incurred by statutorily required offices such as the city clerk and the city treasurer may not be included. In Anderson's view, defendant was blatantly misrepresenting its building inspection costs. Defendant was including costs from other city departments, even when those departments received separate fees for the relevant activity, thereby engaging in an impermissible "double dip." Anderson viewed it as inappropriate to charge a building inspection fee to pay for services performed by departments other than the Building Department.

From reviewing the city budgets and the CAFRs, Anderson determined that there were internal inconsistencies in the CAFRs and that defendant was earning more in fees than the amount of its actual costs each year. In Anderson's view, this explained why defendant was changing its manner of determining costs; defendant was claiming to have lost money in performing building inspection services. Defendant was improperly counting more than $400,000 in costs from other departments as direct costs of the Building Department and then calculating indirect costs as a percentage of the alleged direct costs. Defendant was engaging in a "triple dip" by counting as indirect costs a percentage of alleged direct costs from other departments for which defendant collected a separate fee.

Anderson had also reviewed an expense report or spreadsheet recently prepared by defendant's CFO, Maleszyk, in purported support of the 2020-2021 CAFR. In this new expense report, defendant was continuing to calculate indirect costs as a percentage of direct costs that improperly included alleged costs from departments other than the Building Department. This new expense report did not give Anderson confidence that defendant was making any effort to follow the law. Anderson did not view this new document as credible because he believed it was prepared for this litigation and contradicted information in the 2020-2021 CAFR. Anderson preferred to rely on the CAFR because it was legally required and provided to the City Council, the Michigan Department of Treasury, and the public. This new expense report indicated that defendant was now including $600,000 in costs from other departments and was continuing to "triple dip" by calculating indirect costs as a percentage of these improperly included direct costs.

Anderson later clarified his testimony regarding the internal inconsistencies in defendant's CAFRs. Anderson testified that the main statements of expenditures in defendant's CAFRs did not show a deficit but showed the actual expenditures. However, there were discrepancies between the statements of expenditures and the "notes" sections of the CAFRs, which showed a deficit. For example, the "notes" section of the 2018-2019 CAFR showed direct costs different from what was in the statement of expenditures in that same CAFR. Significant discrepancies between the "notes" section and the main body of the document likewise existed in the 2019-2020 and 2020-2021 CAFRs. Purported costs from other city departments were included in the "notes" sections and in Maleszyk's spreadsheets.

Anderson testified regarding provisions of defendant's contract with SAFEbuilt requiring SAFEbuilt to coordinate or work in unison with other city departments. Those provisions did not mean that the other city departments were performing building inspection work.

The trial court found that Anderson "testified in a credible and forthright manner" and that his testimony was persuasive. This Court "give[s] deference to the trial court's superior ability to judge the credibility of the witnesses who appeared before it." *Glen Lake-Crystal River Watershed Riparians*, 264 Mich App at 531 (quotation marks and citations omitted).

The trial court found that, following the issuance of our Supreme Court's opinion in *MAHB IV*, defendant "increased its direct costs using 'costs' not envisioned by the CCA. These newly designated 'direct costs' escalated the indirect costs proportionately," given that defendant calculated indirect costs as a percentage of direct costs. Defendant "used this analysis to continue to justify retaining surplus funds." The court determined that defendant's "financial reports clearly show that the actual costs of their [B]uilding [D]epartment fell under budget for calendar [sic: fiscal] years ending in 2020 and 2021. The [c]ourt agrees with Mr. Anderson's testimony that [defendant] can only charge for building code work and that other city departments are not performing such work." The trial court agreed with MAHB

> that the true direct costs of the Building Department are those set forth on [page] 38 of the financial reports and that the spreadsheets setting forth other department costs cannot be added to the Building Department costs as "additional" direct costs. The calculation of indirect costs using the percentages set forth on [page] 59 of the financial reports should have been applied to these direct costs. The [c]ourt also agrees with Mr. Anderson's testimony that if you remove the double charges, clerk and treasury charges and costs not related to the [B]uilding [D]epartment's express functions the remaining indirect costs authorized by law are those incurred by [defendant's] Human Resources, Purchasing and Finance Departments. These totaled $5,772.26 in [the 2019-2020 fiscal year] and $7,369.00 in [the 2020-2021 fiscal year].

The trial court further expressed its disagreement with defendant's position that

> Huerta could assign [B]uilding [D]epartment functions to other departments or that the [SAFEbuilt] contract requiring "coordination" with other departments meant allowing other departments to do [B]uilding [D]epartment work. Nowhere in the CCA does it state that a building official can delegate [B]uilding [D]epartment functions to other city departments.

The trial court's findings were supported by the evidence at trial, including Anderson's testimony, and the court's legal conclusions conformed with the applicable law. Defendant's inclusion of costs incurred by other city departments was inconsistent with the CCA. MCL 125.1522(1) requires consideration of costs incurred from services performed by the enforcing agency, which, as admitted by defendant's own witnesses, was the Building Department in this case. The trial court properly concluded that defendant could not "continue to designate other department costs as being direct costs of the [B]uilding [D]epartment and use a percentage of these inflated costs to calculate its indirect costs. This method of calculating costs violates the

CCA's requirement that fees be related to [*B*]*uilding* [*D*]*epartment costs*." The court also correctly reasoned that SAFEbuilt's purported contractual duty to coordinate with other city departments did not mean that the other departments were performing Building Department work. Accordingly, the trial court did not err in its determination that defendant violated the CCA.

Finally, we disagree with defendant's contention that the CCA claim should have been dismissed as moot in light of the termination of defendant's contract with SAFEbuilt. Courts generally do not decide moot issues. *B P 7 v Bureau of State Lottery*, 231 Mich App 356, 359; 586 NW2d 117 (1998) (citation omitted). "A case is moot when it presents only abstract questions of law that do not rest upon existing facts or rights." *Id*. An issue is moot when an event occurs that makes it impossible to grant relief. *Id*. In rejecting defendant's mootness argument, the trial court aptly noted that, despite the termination of the contract with SAFEbuilt, defendant "still has to comply with the CCA and ensure that its fees are related to its direct and indirect costs." The evidence at trial indicated that defendant was continuing to calculate its indirect costs in a manner that violated the CCA. Anderson testified that defendant's termination of its contract with SAFEbuilt did not affect any of Anderson's conclusions, given the most recent expense report indicating that defendant intended to continue calculating costs improperly. The trial court therefore did not err in rejecting defendant's contention that the CCA claim was moot.

Affirmed in part, reversed in part, and remanded for entry of judgment in favor of MAHB on its Headlee Amendment claim. We do not retain jurisdiction.


/s/ Anica Letica
/s/ Mark T. Boonstra
/s/ Philip P. Mariani

-23-

# EXHIBIT C



# CITY OF
# ROYAL OAK

FINAL ADOPTED
BUDGET

FOR THE FISCAL
YEAR 2023-2024

**Royal Oak**

# STATE CONSTRUCTION CODE FUND

**FISCAL YEAR 2023-2024 ANNUAL BUDGET**



## MISSION STATEMENT

*The mission of the inspection division of the building division is to effectively administer the Michigan construction codes and local ordinances to ensure public health, safety and welfare.*

## OVERVIEW

Pursuant to the provisions of Section 9 of Act No. 230 of the Michigan Public Act of 1972 (MCLA § 125.1509), the Royal Oak building official is designated as the enforcing agency to discharge the responsibilities of the act. The city's building division assumes responsibility for the administration and enforcement of the act within the corporate limits.

The building inspection division issues permits for commercial and residential construction projects and performs related building, mechanical, electrical and plumbing inspections throughout the construction process to ensure compliance with state construction codes and local ordinances. Fees are intended to cover the costs of this special revenue fund.

The building division of the community development department consists of two areas: building inspection and code enforcement.

**OPERATING INDICATORS AND PERFORMANCE TRENDS ARE SUMMARIZED AT THIS LINK.**

June 14, 2023

# BUDGET SUMMARY - REVENUE

State Construction Code Fund - Revenue

| | 2019 - 20 Actual | 2020 - 21 Actual | 2021 - 22 Actual | 2022 - 23 Adopted Budget | 2022 - 23 Current Budget | 2022 - 23 6 Month Actuals | 2022 - 23 Projected Activity |
|---|---|---|---|---|---|---|---|
| Licenses, Charges & Fines | $2,839,477 | $2,695,342 | $2,301,728 | $1,682,500 | $3,288,500 | $1,871,270 | $2,763,400 |
| Interest And Contributions | $177,633 | $29,757 | $34,178 | $12,000 | $375,000 | $123,080 | $251,940 |
| Use of Fund Balance | $0 | $0 | $0 | $561,080 | $0 | $0 | $0 |
| Other | $67,995 | $87,973 | $64,900 | $30,000 | $30,000 | $4,910 | $10,750 |
| TOTAL | $3,085,104 | $2,813,072 | $2,400,807 | $2,285,580 | $3,693,500 | $1,999,260 | $3,026,090 |

| | 2023-24 Managers Budget | 2023 - 24 Adopted Budget | 2024-25 Forecast | 2025-26 Forecast | 2026-27 Forecast | 2027-28 Forecast |
|---|---|---|---|---|---|---|
| Licenses, Charges & Fines | $2,324,100 | $2,324,100 | $2,440,305 | $2,562,320 | $2,690,436 | $2,824,958 |
| Interest And Contributions | $277,100 | $277,100 | $279,871 | $282,670 | $285,496 | $288,351 |
| Use of Fund Balance | $0 | $0 | $0 | $0 | $0 | $0 |
| Other | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 |
| TOTAL | $2,631,200 | $2,631,200 | $2,750,176 | $2,874,990 | $3,005,933 | $3,143,309 |

# BUDGET SUMMARY - EXPENDITURES

State Construction Code Fund - Expenditures

| | 2019 - 20 Actuals | 2020 - 21 Actual | 2021 - 22 Actual | 2022 - 23 Adopted Budget | 2022 - 23 Current Budget | 2022 - 23 6 Month Actuals | 2022 - 23 Projected Activity |
|---|---|---|---|---|---|---|---|
| Personnel | $975,847 | $1,077,411 | $1,231,086 | $1,622,832 | $1,622,832 | $634,510 | $1,238,980 |
| Operational | | | | | | | |
| Other Operating | $399,026 | $448,428 | $500,134 | $638,740 | $638,740 | $256,670 | $493,940 |
| Supplies | $6,841 | $6,825 | $11,850 | $21,000 | $71,000 | $8,980 | $62,000 |
| Transfers-Out | $38,000 | $3,000 | $4,000 | $3,000 | $3,000 | $0 | $3,000 |
| OPERATIONAL TOTAL | $443,866 | $458,254 | $515,984 | $662,740 | $712,740 | $265,650 | $558,940 |
| Increase in Fund Balance | $0 | $0 | $0 | $0 | $1,357,920 | $0 | $0 |
| TOTAL | $1,419,713 | $1,535,665 | $1,747,069 | $2,285,572 | $3,693,492 | $900,160 | $1,797,920 |

| | 2023-24 Managers Budget | 2023 - 24 Adopted Budget | 2024-25 Forecast | 2025-26 Forecast | 2026-27 Forecast | 2027-28 Forecast |
|---|---|---|---|---|---|---|
| Personnel | $1,722,164 | $1,722,162 | $1,780,060 | $1,840,025 | $1,902,137 | $1,966,479 |
| Operational | | | | | | |
| Other Operating | $588,100 | $588,100 | $603,357 | $619,181 | $635,593 | $652,614 |
| Supplies | $21,000 | $21,000 | $21,760 | $22,550 | $23,371 | $24,225 |
| Transfers-Out | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 |
| OPERATIONAL TOTAL | $614,100 | $614,100 | $630,117 | $646,731 | $663,964 | $681,839 |
| Increase in Fund Balance | $0 | $294,938 | $0 | $0 | $0 | $0 |
| TOTAL | $2,336,264 | $2,631,200 | $2,410,177 | $2,486,755 | $2,566,101 | $2,648,318 |

June 14, 2023

## REVENUE IN EXCESS OF EXPENDITURES

State Construction Code Fund - Revenue > Expenditures

| | 2019 - 20 Actual | 2020 - 21 Actual | 2021 - 22 Actual | 2022 - 23 Adopted Budget | 2022 - 23 Current Budget | 2022 - 23 6 Month Actuals | 2022 - 23 Projected Activity |
|---|---|---|---|---|---|---|---|
| Revenues | $3,085,104 | $2,813,072 | $2,400,807 | $2,285,580 | $3,693,500 | $1,999,260 | $3,026,090 |
| Expenses | $1,419,713 | $1,535,665 | $1,747,069 | $2,285,572 | $3,693,492 | $900,160 | $1,797,920 |
| REVENUES LESS EXPENSES | $1,665,391 | $1,277,408 | $653,737 | $8 | $8 | $1,099,100 | $1,228,170 |

| | 2023-24 Managers Budget | 2023 - 24 Adopted Budget | 2024-25 Forecast | 2025-26 Forecast | 2026-27 Forecast | 2027-28 Forecast |
|---|---|---|---|---|---|---|
| Revenues | $2,631,200 | $2,631,200 | $2,750,176 | $2,874,990 | $3,005,933 | $3,143,309 |
| Expenses | $2,336,264 | $2,631,200 | $2,410,177 | $2,486,755 | $2,566,101 | $2,648,318 |
| REVENUES LESS EXPENSES | $294,936 | $0 | $339,999 | $388,235 | $439,832 | $494,991 |

## SIGNIFICANT PROGRAM NOTES - FISCAL YEAR 2023-2024

- Permit revenues - budgeted increase of 11 percent; however, activity is unpredictable / cyclical and permit revenues can vary greatly from year to year.

- Personnel costs – budget remains unchanged and continues to include four inspector position vacancies:  1 building and 3 mechanical.

- Office Equipment / Furniture (non-capitalized) – budgeted decrease due to the one-time purchase of office cubicle walls and furniture in fiscal year 2022-23.

- Miscellaneous contracted services - budgeted decrease due to the customer management system project budgeted in fiscal  year 2022-23 to be undertaken in a future fiscal year.

- Printing and document duplicating – budgeted decrease due to the multi-year document duplication / scanning project approaching completion.

June 14, 2023

# DEPARTMENTAL ORGANIZATIONAL CHART



# COST CENTER POSITION DETAIL - HOME BASE

## FULL-TIME AND PERMANENT PART-TIME EMPLOYEES

Building

| Position Detail | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 | FY2021 | FY2022 |
|---|---|---|---|---|---|---|---|
| Amount | | | | | | | |
| Deputy Building Official | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Mechanical Inspector | 1.00 | 1.00 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 |
| Building Inspectors | 3.00 | 3.00 | 3.00 | 3.00 | 3.00 | 3.00 | 3.00 |
| Community Development Liaison / Planer II | 0.50 | 0.50 | 0.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| Plumbing Inspector | 1.00 | 1.00 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 |
| Assistant C.D. Director / Building Official | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| CS III Inspection | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Inspection - MC III | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Electrical Inspector | 1.00 | 1.00 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 |
| AMOUNT | 10.50 | 10.50 | 13.50 | 13.00 | 13.00 | 13.00 | 13.00 |

| Position Detail | FY2023 | FY2024 |
|---|---|---|
| Amount | | |
| Deputy Building Official | 1.00 | 1.00 |
| Mechanical Inspector | 2.00 | 2.00 |
| Building Inspectors | 3.00 | 3.00 |
| Community Development Liaison / Planer II | 0.00 | 0.00 |
| Plumbing Inspector | 2.00 | 2.00 |
| Assistant C.D. Director / Building Official | 1.00 | 1.00 |
| CS III Inspection | 1.00 | 1.00 |
| Inspection - MC III | 1.00 | 1.00 |
| Electrical Inspector | 2.00 | 2.00 |
| AMOUNT | 13.00 | 13.00 |

**RETURN TO OPERATING BUDGETS SUMMARY PAGE**

June 14, 2023

# EXHIBIT D



December 5, 2022

Mr. Kevin Duhonich
Deputy Chief Building Official
Building Department
City of Royal Oak
203 S. Troy Street
Royal Oak, MI  48067

RE:     118 N. Main
        Royal Oak, MI

Kevin,

We have received the plan review fee for the above referenced project and respectfully disagree with your evaluation of the core and shell cost at $34 million dollars.  The core and shell of this building is dramatically less than your valuation.

We are paying the $317,347.00 building permit fee in protest in order to keep the project moving forward and have permits, including the foundation permit issued.  We are requesting a meeting with you next week to further discuss this matter and review actual costs on the project.  After showing you the real costs, we would anticipate a partial refund of the fee.

We appreciate your consideration in this matter.

Sincerely,

Jason Gekiere
Manager
Tower Construction, LLC
jasong@tower-construct.com

# EXHIBIT E

# City of Royal Oak, Michigan Comprehensive Annual Financial Report

FISCAL YEAR ENDING JUNE 30, 2019



**Life** Now Playing

# CITY OF ROYAL OAK, MICHIGAN

## Schedule of Revenues, Expenditures and Changes in Fund Balance
Budget and Actual - State Construction Code Fund
For the Year Ended June 30, 2019

| | Original Budget | Final Budget | Actual | Actual Over (Under) Final Budget |
|---|---|---|---|---|
| **Revenues** | | | | |
| Licenses and permits | $ 1,812,500 | $ 3,449,680 | $ 3,615,406 | $ 165,726 |
| Interest and rentals | 50,000 | 209,820 | 218,024 | 8,204 |
| Other revenue | 50,000 | 50,000 | 88,326 | 38,326 |
| **Total revenues** | 1,912,500 | 3,709,500 | 3,921,756 | 212,256 |
| **Expenditures** | | | | |
| Current - | | | | |
| Public safety | 1,909,500 | 2,843,500 | 1,720,169 | (1,123,331) |
| Revenues over expenditures | 3,000 | 866,000 | 2,201,587 | 1,335,587 |
| **Other financing uses** | | | | |
| Transfers out | (3,000) | (866,000) | (866,000) | - |
| **Net change in fund balance** | - | - | 1,335,587 | 1,335,587 |
| Fund balance, beginning of year | 8,468,816 | 8,468,816 | 8,468,816 | - |
| **Fund balance, end of year** | $ 8,468,816 | $ 8,468,816 | $ 9,804,403 | $ 1,335,587 |

# CITY OF ROYAL OAK, MICHIGAN

## Schedule of Revenues, Expenditures and Changes in Fund Balance
Budget and Actual - Donations Fund
For the Year Ended June 30, 2019

| | Original Budget | Final Budget | Actual | Actual Over (Under) Final Budget |
|---|---:|---:|---:|---:|
| **Revenues** | | | | |
| Interest and rentals | $ 6,000 | $ 6,000 | $ 7,460 | $ 1,460 |
| Contributions and donations | 35,000 | 35,000 | 38,859 | 3,859 |
| **Total revenues** | 41,000 | 41,000 | 46,319 | 5,319 |
| **Expenditures** | | | | |
| Current: | | | | |
| Public safety | - | 900 | 900 | - |
| Recreation and culture | 65,110 | 64,210 | 31,163 | (33,047) |
| **Total expenditures** | 65,110 | 65,110 | 32,063 | (33,047) |
| Revenues over (under) expenditures | (24,110) | (24,110) | 14,256 | 38,366 |
| **Other financing sources (uses)** | | | | |
| Transfers in | 20,000 | 20,000 | 20,000 | - |
| Transfers out | (15,000) | (184,080) | (180,701) | (3,379) |
| **Total other financing sources (uses)** | 5,000 | (164,080) | (160,701) | (3,379) |
| **Net change in fund balance** | (19,110) | (188,190) | (146,445) | 41,745 |
| Fund balance, beginning of year | 495,504 | 495,504 | 495,504 | - |
| **Fund balance, end of year** | $ 476,394 | $ 307,314 | $ 349,059 | $ 41,745 |

# City of Royal Oak, Michigan



## Year Ended June 30, 2024

## Annual Comprehensive Financial Report

**City Commission**

*Mayor*
Michael Fournier

*Mayor Pro Tem*
Monica Hunt

*Commissioners*

Rebecca Cheezum
Sharlan Douglas
Amanda Herzog

Brandon Kolo
Melanie Macey

**Administration**

*Interim City Manager*
Mark Wollenweber

*Director of Finance*
Kymberly Coy

*Assistant Finance Director*
Anthony DeCamp

**Prepared by the Finance Department**

**CITY OF ROYAL OAK, MICHIGAN**

■ **Balance Sheet**
Governmental Funds
June 30, 2024

| | General | Public Safety | Local Streets | State Construction Code | City Capital Projects |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash and investments | $ 16,255,336 | $ 3,815,898 | $ 4,444,890 | $ 16,439,087 | $ 14,818,901 |
| Receivables, net | 3,259,245 | 962,305 | 7,343 | - | - |
| Due from other governmental units | 1,236,646 | 2,805 | 312,185 | - | - |
| Due from other funds | 340,408 | - | - | - | - |
| Prepaid items | 93,395 | - | - | - | - |
| Inventories | - | - | 47,931 | - | - |
| Restricted assets, cash | - | - | - | - | - |
| **Total assets** | $ 21,185,030 | $ 4,781,008 | $ 4,812,349 | $ 16,439,087 | $ 14,818,901 |
| **Liabilities** | | | | | |
| Accounts payable | $ 960,567 | $ 96,026 | $ 2,349,141 | $ 3,917 | $ 152,802 |
| Accrued and other liabilities | 326,773 | 1,308,174 | 536,574 | 36,078 | - |
| Due to other funds | - | - | - | - | - |
| Cash bonds and deposits | 5,249,653 | - | - | - | - |
| Unearned revenue | - | - | - | - | - |
| **Total liabilities** | 6,536,993 | 1,404,200 | 2,885,715 | 39,995 | 152,802 |
| **Deferred inflows of resources** | | | | | |
| Unavailable revenue | 46,424 | 654,587 | 7,343 | | |
| Deferred lease amounts | 2,067,545 | - | - | - | - |
| **Total deferred inflows of resources** | 2,113,969 | 654,587 | 7,343 | - | - |
| **Fund balances** | | | | | |
| Nonspendable: | | | | | |
| Prepaid items | 93,395 | - | - | - | - |
| Inventories | - | - | 47,931 | - | - |
| Endowment | - | - | - | - | - |
| Restricted: | | | | | |
| PEG fees | 1,058,392 | - | - | - | - |
| Highways and streets | - | - | 1,871,360 | - | - |
| Solid waste | - | - | - | - | - |
| Recreation and culture | - | - | - | - | - |
| Public safety | - | - | - | 16,399,092 | - |
| Indigent defense | - | - | - | - | - |
| Grants | - | - | - | - | - |
| Debt service | - | - | - | - | - |
| Capital projects | - | - | - | - | - |
| Permanent fund | - | - | - | - | - |
| Opioid settlement | - | 136,182 | - | - | - |
| Committed for capital projects | - | - | - | - | 14,666,099 |
| Assigned: | | | | | |
| Eligible retiree bank payouts | 525,561 | 475,572 | - | - | - |
| Public safety | - | 2,110,467 | - | - | - |
| Unassigned | 10,856,720 | - | - | - | - |
| **Total fund balances** | 12,534,068 | 2,722,221 | 1,919,291 | 16,399,092 | 14,666,099 |
| **Total liabilities, deferred inflows of resources and fund balances** | $ 21,185,030 | $ 4,781,008 | $ 4,812,349 | $ 16,439,087 | $ 14,818,901 |

The accompanying notes are an integral part of these financial statements.

| | Nonmajor Governmental Funds | Total Governmental Funds |
|---|---|---|
| | $    11,256,456 | $    67,030,568 |
| | 3,442,943 | 7,671,836 |
| | 1,572,538 | 3,124,174 |
| | - | 340,408 |
| | 13,292 | 106,687 |
| | 221,702 | 269,633 |
| | 1,069 | 1,069 |
| | $    16,508,000 | $    78,544,375 |
| | | |
| | $    2,142,902 | $    5,705,355 |
| | 199,509 | 2,407,108 |
| | 340,408 | 340,408 |
| | 2,650 | 5,252,303 |
| | 3,165,987 | 3,165,987 |
| | 5,851,456 | 16,871,161 |
| | | |
| | 899,133 | 1,607,487 |
| | - | 2,067,545 |
| | 899,133 | 3,675,032 |
| | | |
| | 13,292 | 106,687 |
| | 221,702 | 269,633 |
| | 1,069 | 1,069 |
| | - | 1,058,392 |
| | 2,234,650 | 4,106,010 |
| | 2,535,619 | 2,535,619 |
| | 2,890,266 | 2,890,266 |
| | - | 16,399,092 |
| | 83,380 | 83,380 |
| | 1,718,019 | 1,718,019 |
| | 16,782 | 16,782 |
| | 30,772 | 30,772 |
| | 11,860 | 11,860 |
| | - | 136,182 |
| | - | 14,666,099 |
| | - | 1,001,133 |
| | - | 2,110,467 |
| | - | 10,856,720 |
| | 9,757,411 | 57,998,182 |
| | $    16,508,000 | $    78,544,375 |